CONSUMERS POWER COMPANY, Plaintiff,

v.

NUCLEAR FUEL SERVICES, INC., Defendant.

No. CIV–76–88C.

United States District Court, W. D. New York.

March 4, 1981.

Miller & Chevalier, Washington, D. C. (Clarence T. Kipps, Jr., John Lloyd Rice, and Ronald K. Henry, Washington, D. C., of counsel), and Jaeckle, Fleischmann & Mugel, New York City (William I. Schapiro, Buffalo, N. Y., of counsel), for plaintiff.

Hodgson, Russ, Andrews, Woods & Goodyear, Buffalo, N. Y. (Stephen H. Kelly, and Richard F. Campbell, Buffalo, N. Y., of counsel), for defendant.

CURTIN, Chief Judge.

Nuclear energy is currently a hot topic of debate in the body politic. It has been variously described as the answer to our domestic energy needs and as a potential poison threatening the very existence of society. One of the more controversial areas of disagreement concerns the storage and recycling of spent nuclear fuel. Questions have been raised as to the safety of nuclear reprocessing installations, as a result of dangers presented by both manmade and natural phenomena. *See generally*, Comptroller General, *Efforts to Clean Up the Shut-Down Western New York Nuclear Service Center* (June 6, 1980). As federal and state governments struggle with assessing the danger of nuclear energy as compared with its potential benefit, the industry has continued to negotiate contracts for the disposal of spent nuclear fuels. On occasion, government safety regulations impose limitations on existing contracts, rather than have effect only prospectively on new contracts. When regulatory restrictions and contract rights conflict, the courts are called upon to decide which con-

tract rights survive. Such is the present controversy.

### FACTS

In 1970, Consumers Power Company, an electric utility located in Jackson, Michigan, entered into a contract with Nuclear Fuel Services, Inc., of Rockville, Maryland, for the chemical reprocessing and supply of Consumers Power's nuclear fuels. The reprocessing was to be performed at the Nuclear Fuel Services plant in West Valley, New York. The contract was let pursuant to bid specifications issued by Consumers Power. By the terms of the contract, which was dated October 14, 1970, the parties anticipated that Nuclear Fuel Services would reprocess Consumers Power's spent nuclear fuel, making it reusable or, in the alternative after January 1, 1975, supply Consumers Power with equivalent material.

At the time that the contract was entered into, both parties were aware that Nuclear Fuel Services contemplated undergoing a substantial revamping and expansion of its West Valley reprocessing facility. They apparently expected the construction to be completed early in the decade. They made provision for an equitable adjustment due to changes in costs which had taken place during the construction period, but such adjustment was not to take into account costs attributable to the then contemplated revamp and expansion program itself. Although in 1972 Nuclear Fuel Services did cease reprocessing in order to undertake these changes in its West Valley plant, the contemplated plant improvements were never executed, and the plant never reopened.[1] In fact, except for approximately six tons processed prior to the shut-down early in 1972, the contract has not been performed.

The facts which led up to this situation are somewhat confusing, but I have tried to set them out as clearly as I can. In 1972, at about the same time that the plant was closed to permit the expansion work, the Atomic Energy Commission notified Nuclear Fuel Services that a construction permit would be required for Nuclear Fuel Services to continue the revamp and expansion program. Nuclear Fuel Services, in response, filed an application for such license which would have enabled it to construct and operate the modified plant. Although considerable engineering work had already been completed and some manufactured components delivered, the actual construction work could not begin without the permit. Consequently, the scheduled dates for completion of the project and resumption of reprocessing was pushed back several years to 1975 or 1976.

The next event took place on February 7, 1975, when Consumers Power notified Nuclear Fuel Services that it was exercising its option under the contract for equivalent material. Subsequently, in May 1975, the Nuclear Regulatory Commission, which had by that time replaced the Atomic Energy Commission, announced that it would decide whether to permit the recycling of plutonium in 1978. This pushed the date for reopening the plant back even further.

At about that time, Nuclear Fuel Services also undertook an evaluation of the financial impact of changes in regulatory requirements related to the licensing process. This evaluation led Nuclear Fuel Services to the conclusion that resumption of operations at West Valley could not take place at least until 1983, well after the time when Nuclear Fuel Services claims to have expected performance under the contract to have been completed. As a result, on July 11, 1975, Nuclear Fuel Services notified Consumers Power that the contract was at an end "as a result of the regulatory situation."

On February 23, 1976, Consumers Power formally rejected Nuclear Fuel Services' position and requested delivery of the equivalent material by December 31, 1976. In

---

1. The court takes note that there is a dispute currently pending in part concerning the future of the West Valley facility. *New York State Energy Research and Development Authority* *v. Nuclear Fuel Services, Inc.*, Civ. 81–18E (W.D.N.Y.). There does not appear to be any indication, however, that the plant is to be put back into operation in the near future.

addition, on February 24, 1976, Consumers Power filed the instant lawsuit. Nuclear Fuel Services contends the option for equivalent material was not validly exercised and that in no event would delivery have been required under the contract until "well·into 1977."

In April 1976, the Nuclear Regulatory Commission increased the seismic requirements for the Nuclear Fuel Services plant. Nuclear Fuel Services evaluated the construction which would have been required to comply with the new seismic requirements and in June 1976, concluded that the changes in the regulatory requirements had made the entire West Valley project commercially impracticable. The Nuclear Fuel Services Board voted to withdraw from the business of reprocessing entirely on September 17, 1976.

## PROCEDURAL HISTORY

Plaintiff moved for partial summary judgment on June 2, 1976, and defendant cross-moved for summary judgment on September 13, 1976.[2] Because the parties continued to submit affidavits, oral argument was adjourned by consent until November 3, 1976. On January 13, 1977, I denied the motion for summary judgment from the bench.

While I was preparing a written order explaining my decision, President Carter issued a statement on April 7, 1977, regarding national nuclear fuel policy. After reviewing this statement, I directed the parties to submit a memorandum explaining the new government policy and its effect on the lawsuit. Order of April 21, 1977. Subsequently, the Nuclear Regulatory Commission issued an order with respect to the same matter, and I directed the parties to file supplemental memoranda regarding the Commission's order as well. Order of January 18, 1978. All memoranda were received on February 12, 1979.

Since at that point the case had seemingly become one primarily concerned with damages rather than specific performance, I did not assign it a priority for decision. In addition, I wanted time to consider the complex factual issues as well as the numerous novel questions of law which the case poses. There was also some indication that the parties were still reviewing their positions. I kept the case under court review until January 17, 1980, when oral argument was scheduled on the effect of President Carter's and the Nuclear Regulatory Commission's statements on the lawsuit, and on the summary judgment motion. After several adjournments due to calendar congestion, oral argument finally took place on February 15, 1980, at which time the case was marked submitted.

## ARGUMENTS

Defendant makes several arguments as to why plaintiff is not entitled to recovery. First, it asserts that the government voided defendant's license to perform the reprocessing of nuclear fuels in April 1977, when President Carter issued his statement. Since the continuation of the license in force was a condition of the contract, defendant argues that even if it did breach, its duty to perform was discharged by a condition subsequent. Defendant argues, in effect, that had the contract continued, the promisee, Consumers Power, would not have been entitled to the performance, though apparently so entitled when the promisor, Nuclear Fuel Services, became unable to perform in 1977. *Restatement of Contracts* § 396 (1932 ed.); *New York Trust Co. v. Island Oil & Transport Corp.*, 34 F.2d 653, 654 (2d Cir. 1929).

In addition, defendant claims that the contract was terminated by operation of Article 19.2, which provides in part that the contract shall terminate upon "revocation of the license granted to NFS by the AEC authorizing NFS to engage in the process-

---

2. On July 13, 1976, after Nuclear Fuel Services had repudiated and after plaintiff had made its motion for partial summary judgment, Nuclear Fuel Services issued a notice of increased cost, allegedly pursuant to Article 20 of the contract.

That notice is important to this lawsuit because Nuclear Fuel Services claims that Consumers Power's unwillingness to accept the new terms effectively terminated the contract.

ing business contemplated by this Contract." Defendant points to the government's decision to bar commercial reprocessing of spent nuclear fuel in the entire country as well as to the Nuclear Regulatory Commission denial of Nuclear Fuel Services' license application to operate a revamped and expanded plant at West Valley. Defendant argues that these government actions had the effect of terminating the contract effective April 1977, in any event.

Defendant has a third argument. It claims that the 1977 actions make it legally impossible to perform essential terms of the contract, specifically those having to do with reprocessing. Moreover, terms such as "equivalent material" cannot be established with precision in the absence of actual reprocessing. In any event, Nuclear Fuel Services asserts the contract was terminated under Article 20 when, in July 1976, the parties failed to arrive at an "equitable adjustment" in the charges which Consumers Power would have to pay for Nuclear Fuel Services' performance. Nuclear Fuel Services takes the position that Article 20 is a "walk away" provision and requires no negotiation before it can be invoked to terminate the contract.[3]

Plaintiff, for its part, evidently claims the contract is still in effect. Plaintiff's posi-

---

3. ARTICLE 20—CHANGES IN REGULATORY REQUIREMENTS

20.1 *General*—Subject to the provisions of Section 20.2 of this Article 20, if after the date hereof there is any change in regulatory requirements of the AEC or other federal or state agencies having jurisdiction (which shall include the imposition of any license change with which NFS must comply in order to continue effectively its reprocessing business at West Valley, New York) there results an increase in the cost to NFS of performing any of its obligations under this Contract, the parties shall attempt to agree on an equitable adjustment in the charges payable by Consumers Power under this Contract.

If within 60 days after NFS shall notify Consumers Power of an increase in charges under this Contract the parties are unable to agree on same, either party may thereupon terminate this contract, in which event any irradiated fuel then held by NFS for the account of Consumers Power shall be returned to Consumers Power f.o.b. conveyance provided by it at West Valley, New York.

The work presently contemplated by NFS at its plant in West Valley, New York, as part of its current revamp and expansion program shall not justify any increase in charges hereunder to Consumers Power.

*Off Site Waste Disposal.* Included in the charge for reprocessing under this Contract is a sum which includes solidification of Waste Materials generated under this Contract, the shipping from the NFS site at West Valley, New York ("the site") of all solid Waste Materials generated under this Contract and the storage and perpetual care of such solid Waste Materials at another location. The parties recognize that as of the date of this Contract the costs involved in solidifying Waste Materials which would otherwise be stored in liquid form in accordance with NFS' present procedures, shipping all solid Waste Materials from the site to another location and storage and perpetual care thereof are unknown and are beyond the control of either of the parties.

NFS assumes the risk of the cost involved in solidifying Waste Materials generated under this Contract, in conformance with all applicable laws and regulations, which would otherwise be stored on the site in liquid form and no additional charge shall be made to Consumers Power for cost involved in solidifying such Waste Materials. However, the reprocessing charge shall be adjusted for shipping all solid Waste Materials generated under this Contract and for storage and perpetual care thereof at another location under the following circumstances and as follows: (a) As soon as practicable after the promulgation of any law or regulation requiring the solidification of Waste Materials and the shipping of solid Waste Materials off the site and after costs can be estimated, NFS will inform Consumers Power of the estimated cost to NFS of shipping such solid Waste Materials off the site and storage and perpetual care thereof at such other location (which charges are hereinafter referred to as "shipping and storage charges"). If Consumers Power shall agree to such estimated cost of shipping and storage charges within the limits of subparagraph (d) below, then to the extent such shipping and storage charges exceed an amount equal to $2,400 per MTU of irradiated fuel which generates such Waste Materials the processing charge shall be increased by the amount of such excess (hereinafter referred to as "additional charge"). The cost of shipping and storing Waste Materials shall include the cost of containers that are required to be left at the storage location. The additional charge per ton or irradiated fuel shall be retroactive to cover fuel then processed under this Contract as well as prospective. The retroactive portion shall be

tion is essentially as follows: Nuclear Fuel Services repudiated the contract in 1975, well before the 1977 actions by the government. At that time, it was not reprocessing but did enter into storage contracts with other customers. The rights of the parties were fixed as of 1975 by Nuclear Fuel Services' anticipatory repudiation. Consumers Power properly brought an action for breach as of that date. UCC 2–713. Subsequent termination, possibly under Article 20 or as a result of other unforseeable events, such as President Carter's decision to bar reprocessing, did not impair the right to damages which became fixed on the date of the initial repudiation.

Second, even if subsequent events are considered, the Contract has not been terminated under Article 19.2, which states that in the event of a license modification, "this Contract shall be modified only to the extent necessary to exclude the performance of such obligations, but shall otherwise remain in full force and effect . . . ."[4] The Nuclear Regulatory Commission decision

paid at the time the additional charge is determined. If Consumers Power shall not agree to such estimated cost, an additional charge shall be determined under the provisions of Article 14 hereof. When such shipping and storage charges have been determined as above provided, same shall thereafter be increased or decreased based upon any increase or decrease in shipping and storage charges which are within the control of a third party.

(b) The parties recognize that if for any reason this Contract shall terminate prior to the time the shipping and storage charge shall have been determined under subparagraph (a) above, NFS will have on the site Waste Materials generated under this Contract. If within 90 days after the termination of this Contract the parties are unable to agree on an additional charge applicable to the shipping and storage of such Waste Materials then on hand, an additional charge shall be determined under Article 14 hereof. The additional charge shall be determined and shall be applicable regardless of whether or not at that time any law or regulation shall have been promulgated requiring the shipping of Waste Materials off the site for storage elsewhere, in which event any existing or proposed regulations and the studies and reports of the AEC and its contractors on shipping and storing solid Waste Material shall be relevant in determining such charge.

(c) Once an additional charge shall have been determined under subparagraph (b) above, in no event shall Consumers Power be required to pay any further sum to NFS for shipping and storing charges whether or not such additional charge shall actually cover shipping and storage charges. In no event will NFS be required to refund to Consumers Power any sum included in processing charges or shipping and storage charges or additional charges whether or not Waste Materials shall eventually be shipped off the site for storage elsewhere.

(d) In designing a method of solidification and storage on site of Waste Materials NFS shall give due consideration to relative costs involved in shipping such Waste Materials off site and storage thereof at another location. In computing any additional charge due by Consumers Power under this Section 20.2 shipping and storage charges shall not exceed those which would be applicable if Waste Materials were stored on site in liquid form for five years after generated and in solidified form for five years after solidification.

4. 19.2 *Revocation or Modification of Operating Licenses* Further, this Contract shall terminate forthwith upon the revocation of the license granted to NFS by the AEC authorizing NFS to engage in the processing business contemplated by this Contract. In the event that the license granted to NFS authorizing NFS to engage in the processing business contemplated by this Contract, or the license granted to Consumers Power to operate its plants is amended or modified by the AEC in such a way as to prevent either party from performing any of its obligations hereunder, this Contract shall be modified only to the extent necessary to exclude the performance of such obligations, but shall otherwise remain in full force and effect; provided, however, that any such amendment or modification which results in either party being unable to perform substantially all of its obligations hereunder shall be treated as a revocation of license within the meaning of this Section 19.2. Any irradiated fuel stored or in process at the NFS plant which NFS shall be rendered unable to process or complete the processing of by reason of the revocation or modification of such licenses shall be returned to Consumers Power at the expense of NFS to any location designated by Consumers Power in the continental United States east of the Mississippi River which is licensed to receive such material or if agreeable and acceptable to both parties NFS may in lieu of returning such material to Consumers Power deliver to Consumers Power Equivalent Material under the terms of Article 22 hereof upon which event title to such undelivered material shall pass to NFS.

bars delivery of plutonium, while it permits Nuclear Fuel Services to continue to possess spent fuel. Plaintiff argues that the inability of Nuclear Fuel Services to reprocess does not relieve it of the obligation to receive and store Consumers Power's spent fuel or to deliver equivalent material. Nuclear Fuel Services had exercised its option for equivalent material long before the Nuclear Regulatory Commission action. Consequently, Consumers Power asserts it is entitled to insist that Nuclear Fuel Services take delivery of Consumers Power's spent fuel, even in the face of Article 19.2. Any other construction of the contract would impermissibly read Article 22, the equivalent material section, out of the contract. In short, Consumers Power claims that Nuclear Fuel Services, in effect, assumed the risk of there being regulatory changes and cannot be heard to argue that its performance is excused by reason of impossibility and impracticability. For this reason, the mere increase in expense of performance of the remaining parts of the Contract does not relieve Nuclear Fuel Services of its obligations.

Third, Consumers Power argues that Article 20 is no bar to recovery both because Nuclear Fuel Services did not make a good faith effort to reach an "equitable adjustment" of the price for Nuclear Fuel Services' performance and because the Nuclear Fuel Services proposal included increased costs due to completing the revamp and expansion program. The inclusion of these costs was allegedly in violation of Article 20. In addition, Consumers Power points out that it is anomalous for Nuclear Fuel Services to propose a price increase while holding the position that the contract is no longer in effect.

## LAW

The standard for granting summary judgment is strict. The moving party must show the absence of any material fact issue genuinely in dispute. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 153, 90 S.Ct. 1598, 1606, 26 L.Ed.2d 142 *et seq.* (1970). Furthermore, the well settled rule is that cross motions for summary judgment do not warrant the court granting summary judgment unless one of the moving parties is entitled summary judgment as a matter of law upon facts that are not genuinely disputed. *See* 6 Moore's *Federal Practice* § 56.13 at 2247. The Second Circuit has been reluctant to uphold summary judgment when any fact which may be potentially material remains unresolved. *See Heyman v. Commerce and Industry Insurance Co.*, 524 F.2d 1317 (2nd Cir. 1975); *Judge v. City of Buffalo*, 524 F.2d 1321 (1975). This principle has been firmly established with respect to contractual disputes.

> Where contractual language is susceptible of at least two fairly reasonable interpretations, this presents a triable issue of fact, and summary judgment would be improper.

524 F.2d at 1320.

## ANALYSIS

In the instant dispute, there are four issues. On the current record, I am unable to resolve three of them. The fourth can be resolved in part to the advantage of plaintiff. Because I must substantially deny these motions for summary judgment, thereby requiring a trial on the merits, I will not explore these matters in great detail.

The issues can be divided between those dealing with discharge by supervening frustration and those dealing with common law contract impossibility or impracticability. *See generally*, The Rt. Hon. Lord Denning, *The Discipline of Law* at 32–57 (1979).

*Frustration*

■ Nuclear Fuel Services argues that its duty to perform was discharged by failure of condition subsequent. This argument must fail, at least in part, because it is clear on the facts now before the court that some of the duty to perform became ripe long before President Carter's statement and the issuance of the Nuclear Regulatory Commission's decision.

Nuclear Fuel Services also argues that the contract became a nullity as a matter of law because of frustration of an essential purpose: namely, reprocessing. *Restatement (Second) of Contracts* § 285 (Tent. Draft No. 9, 1974) sets forth this basic rule of law:

> Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary.

The comment to the Restatement section provides a further explanation of the factors to be considered. First, the purpose that is frustrated must have been a principal purpose of that party. Second, the frustration must be substantial. It is not enough that the party will sustain a loss. Third, the non-occurrence of the frustrating event must have been a basic assumption on which the contract was made. The fact that the event was forseeable does not compel the result that the event's non-occurrence was not a basic assumption.

To gain summary judgment under this doctrine, Nuclear Fuel Services must establish that reprocessing is the contract essence, that the regulations were not contemplated by the parties, and that performance under them is not possible. Nuclear Fuel Services cites a number of New York cases which follow the frustration doctrine. *See, e. g., Gardiner Properties, Inc. v. Samuel Reider & Son, Inc.,* 279 App.Div. 470, 111 N.Y.S.2d 88 (1952) [lessee discharged from obligations under lease when the theatre construction on the leased property was prohibited]; *Ask Mr. Foster Travel Service v. Truck Tours, Inc.,* 181 Misc. 91, 43 N.Y. S.2d 674 (Sup.Ct.1943) [value of contract to advertise a business was destroyed because conduct of the business was subsequently prohibited].

Nuclear Fuel Services argues that reprocessing of the spent fuel is clearly the essence of the contract in question. Not only is the agreement titled one for "Chemical Processing Services," but the agreement is filled with many references to reprocessing. However, the contract also clearly provides Consumers Power with an option to request "Equivalent Materials" instead of recovered product from Consumers Power's specific irradiated fuel.

Nuclear Fuel Services argues that this clause is merely a matter of scheduling convenience. It claims that it is only to cover the situation where minor delays have arisen in removal and transportation of fuel.

Consumers Power argues in opposition that Article 22 is an entirely different option. Minor delays, it states, are covered by Article 4.2(a) which concerns determining when equivalent material can be provided without changing the entire nature of the contract. Under Article 22, once Consumers Power has exercised its option, the contract changes to one for the purchase and sale of fuel. It argues that inability to reprocess is irrelevant since this was "contemplated" and otherwise provided for in the contract. Therefore, performance of these terms cannot be excused.

Both sides also supply carefully drawn affidavits from the pens of the contract negotiators who differ sharply as to their respective understandings of the equivalent materials clause. *Compare* Affidavit of Ronald L. Heiks, filed on September 30, 1976, at 2–4, *with* Affidavit of C. R. Moore, filed on August 13, 1976, as Exhibit A at 9.

The court cannot resolve this dispute upon the terms found in the contract alone. Although it would appear that the essence of the agreement is reprocessing, the court cannot read Article 22 out of the agreement. It must therefore have access to documents used by the parties in negotiation of the agreement in order to uncover the real intent behind the contract. Furthermore, it would be helpful to have the parties clarify the market context under which agreement was reached so as to enable the court to discern the practical intent behind the equivalent materials clause. It may also be necessary to have testimony

from the negotiators so that they may explain their intentions in drafting the contract to the court.

Since these questions are substantially controverted and cannot be resolved as a matter of law on the current state of the record, summary judgment must be denied.

*Impossibility or Impracticability*

Nuclear Fuel Services raises two separate questions with respect to impossibility or impracticability. First, the court must determine whether reprocessing of irradiated fuel at West Valley may be held as a matter of law to be impossible or commercially impracticable, thus nullifying the contract under either Article 19 or under the commercial law of the State of New York. Second, the court must resolve whether the parties' failure to agree to an equitable adjustment under Article 20.1 allows them to "walk away" from the contract.

On the first question, the following facts must be considered. Although the parties contemplated a short-term shut-down of the plant for purposes of expansion, this period was extended by changes in government requirements, claims Nuclear Fuel Services, to a minimum of 16 years to 1988, if ever. This is seven years beyond the time of contemplated contract completion, according to Nuclear Fuel Services.

Second, the original cost for expansion anticipated in 1970 was $15 million, while estimated capital costs to resume operations now exceed $600 million. This does not include approximately $6 million per year required to maintain the existing facility and to pay rent, salaries, and other overhead. Furthermore, Nuclear Fuel Services estimates that it must spend $100 million just to discover whether the Nuclear Regulatory Commission would grant the construction permit. Nuclear Fuel Services argues that, taken together, these circumstances have rendered the contract impossible to perform as a matter of law. *See, Maple Farms, Inc. v. City School District of the City of Elmira*, 76 Misc.2d 1080, 352 N.Y.S.2d 784 (Sup.Ct.1974).

Article 19.2 of the contract provides for termination of the contract upon revocation of the Atomic Energy Commission license authorizing Nuclear Fuel Services to engage in the reprocessing business contemplated by this contract. Any amendment or modification which results in either party being unable to perform substantially all of its obligations is to be treated as a revocation of license.

Nuclear Fuel Services states that in Article 19.2 both parties recognized that regulatory actions short of license revocation could substantially interfere with contract performance and give rise to revocation. Here, the drastic changes in Nuclear Regulatory Commission licensing requirements have actually caused Nuclear Fuel Services to end all reprocessing operations at West Valley, requiring contract termination.

Once again, Consumers Power renews its position that only the licensing of plant expansion has been the subject of change and uncertainty, not the license for the existing operation, which is not confined to reprocessing.

■ The court again finds that the record contains issues of fact which forbid this question to be resolved as a matter of law at this time. *E. g.*, whether the contract was intended to be one substantially concerned with reprocessing is unclear. More importantly, the court is not certain as to what kind of license modification Article 19 envisioned which would not terminate the entire contract, nor how this was to be measured.

Nuclear Fuel Services next states its position that under the common law of commercial impossibility or in the alternative, under the New York Uniform Commercial Code 2–615 standard of commercial impracticability, the contract must be voided. Nuclear Fuel Services again cites its inability to reprocess until the middle 1980s and the drastic increase in expenses due to the change in Federal Regulations as being the reasons for voiding the contract. Nuclear Fuel Services cites the Restatement (Second) of Contracts § 281 (Tent. Draft No. 9, 1974) for a general statement of the common law principle:

Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of which was an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to perform under that performance is discharged, unless the language or the circumstances indicate the contrary.

The distinction between difficulty which does not discharge contract obligations and impracticability which does is whether the unanticipated circumstance "has made a performance of the promise vitally different from what was reasonably to be expected." 6 *Williston on Contracts* § 1963 (rev. ed. 1938). Furthermore, Nuclear Fuel Services argues that section 2–615(a) of the Uniform Commercial Code applies here. Although this is a services contract, not one for goods, Nuclear Fuel Services asserts that the Code should apply by analogy. *E. g., United States v. Wegematic Corp.*, 360 F.2d 674, 676 (2d Cir. 1966).

Although the court may take the UCC provision into account by analogy, it has no direct relevance here since the contract is one for services. Moreover, it is clear that a contractual duty is discharged, generally speaking, where performance is subsequently prevented or prohibited by administrative order. *Restatement of Contracts* § 458 (1932). *See W. K. Ewing Co., Inc. v. New York State Teachers' Retirement System*, 14 App.Div.2d 113, 218 N.Y. S.2d 253, 355, *aff'd* 11 N.Y.2d 749, 226 N.Y. S.2d 690, 181 N.E.2d 628 (1962). While Nuclear Fuel Services clearly presents the appropriate legal standard on this ground, the problems of delay and expense are controverted to some extent, thus making summary judgment on this point inappropriate.

Plaintiff questions, for example, both the time and expense figures that Nuclear Fuel Services has put forth. It argues that Nuclear Fuel Services should still have its West Valley plant operating and that, in any case, it could meet regulatory requirements and have the expanded plant in operation by 1983, not 1988. It also interprets the contract to continue beyond 1981 "until completion of all services called for in this contract." Article 2.4. It therefore concludes that time constraints do not nullify the contract.

In regard to expense figures, plaintiff offers no alternative estimates. The court, however, is not an expert in this area, so it has no real basis for evaluation of the figures offered in defendant's affidavits. In order properly to evaluate these estimates, it will be necessary to have the affiants testify in court and be subject to cross-examination on the basis of their conclusions. Since the estimates occasioned by the new Nuclear Regulatory Commission regulations are controverted between the parties, judgment here must also await further proof at trial.

As a separate ground for discharge of its contractual responsibilities, Nuclear Fuel Services argues that the contract has been terminated under Article 20.1 after the failure of the parties to agree upon equitable adjustments in the charges paid by Consumers Power due to the change in the Nuclear Regulatory Commission regulations.[5] Under this article, if no agreement on adjustment is reached within 60 days of notice, the agreement is terminated.

After learning of the change in regulations, Nuclear Fuel Services sent notice to Consumers Power dated July 15, 1976, that due to these changes it would increase the charge for reprocessing from $23,400 per metric tonne of uranium in 1973 to $1,010,300 per metric tonne of uranium. Consumers Power responded in a letter dated September 8, 1976, from J. E. Van Reene which essentially stated that it found it improper for Nuclear Fuel Services to propose a price increase while holding the position that the contract no longer continued to be in effect. However, it acknowledged that an equitable adjustment might be justified and that it would be willing to discuss a procedure for adjustment based upon known costs and requirements. Without response to the Consumers Power offer, Nuclear Fuel Serv-

5. This contract provision is allegedly unique in the industry.

ices terminated the contract by notice dated September 20, 1976.[6]

Consumers Power argues that the July 15 letter was not a good faith effort to propose an equitable adjustment to the contract price and gives no right to terminate the contract. It contends that Nuclear Fuel Services had already decided to close the facility and sent the letter with the expectation that none of its customers would accept the proposal, that increases for revamp and expansion are excluded under the provision, and that the Nuclear Fuel Services proposal unfairly places the entire burden for capital construction on current contract holders.

 The legal issue here is whether this clause may be characterized as a "walk away" provision or requires some good faith attempt at price adjustment before it may be invoked to terminate the contract. Under New York law, the contract controls as to grounds for termination if those grounds are stated. *Missir v. American Oriental Ice Mfg. Co.*, 201 App.Div. 756, 195 N.Y.S. 191 (1922). Where the contract specifies conditions precedent to the right of cancellation, the conditions must be complied with. *General Supply and Construction Co. v. Goelet*, 241 N.Y. 28, 148 N.E. 778 (1925). Article 20.1 provides that

> the parties shall attempt to agree on an equitable adjustment .... If within 60 days ... the parties are unable to agree on same, either party may thereupon terminate the contract.

The court interprets the contract to require an attempt to agree upon an equitable price adjustment. Here, however, Nuclear Fuel Services apparently sent notice of a 4300% price increase, then gave notice of its termination without even responding to Consumers Power's offer to negotiate. In the initial notice under Article 20, Nuclear Fuel Services expressly reserved its claim of contract termination; moreover, it did not give this notice until the plaintiff's motion for summary judgment had already been brought. The court cannot find any "attempt to agree" on the part of Nuclear Fuel Services on this record. Therefore, the independent claim for termination under Article 20 must be denied insofar as defendant wishes to portray it as a walk away clause. This conclusion, of course, does not prevent defendant from demonstrating that it did in fact attempt to arrive at an "equitable adjustment," and that no agreement was forthcoming.

## SUMMARY

The 1970 contract has been drafted by attorneys skilled in the art. The provisions which they have incorporated do not readily reveal whether the mutual intent of the parties was to consider the essential purpose of the contract as one solely to reprocess or one with dual obligations to remove spent materials and to provide "equivalent material." The court must have the benefit of further evidence before it can rule on this issue.

In addition, the defendant argues that it must be relieved from the burden of the contract under the doctrines of impossibility and commercial impracticability of performance. To properly deal with this question, the defendant must supply further factual evidence regarding, among other things, the status of the nuclear fuel market both at the time of agreement and subsequently.

Finally, the "equitable adjustment" clause under New York law is not a "walk

---

**6.** Additional facts put this question into perspective. On July 11, 1975, Nuclear Fuel Services sent a letter to Consumers Power which stated that:

> All of NFS' obligations (including equivalent material, fuel shipment and storage under that agreement) are relieved as a result of the regulatory situation ...

Next, in December 1975, it was necessary to discharge the full contents of one of Consumers Power's reactors. Nuclear Fuel Services failed to remove the spent fuel within the 210 days provided under the contract and continues to refuse to do so.

In addition, as noted earlier, Nuclear Fuel Services failed to give notice of a price increase under Article 20.1 until after this litigation was begun on February 24, 1976, and after Consumers Power had noticed the motion for partial summary judgment on June 2, 1976.

away" provision. To the extent Nuclear Fuel Services seeks to use this clause as a defense, under the facts alleged, it must be denied.

As I have determined that summary judgment must be denied, the case will be set on for an early trial. The parties shall meet with the court on March 25, 1981, to discuss how best to proceed.

So ordered.