**Fred SAUER, Plaintiff,**

v.

**XEROX CORPORATION, Defendant.**

No. 95–CV–6485L.

United States District Court,
W.D. New York.

Aug. 18, 1998.

Gordon Locke, Gordon Locke Law Offices, New Rochelle, NY, for Fred Sauer.

John P. Coffey, Latham & Watkins, New York City, for Xerox Corporation.

## DECISION AND ORDER

LARIMER, Chief Judge.

This contentious case has been pending for over three years and this Decision constitutes my fifth substantive determination concerning the merits of plaintiff's claims. Because I have written previously about the factual background of the litigation, I will not reiterate all the facts discussed in my prior decisions, familiarity with which is assumed. I will discuss only those facts pertinent to the analysis of the motions presently pending before me.

Essentially, this is a contract dispute. Sauer was the purchaser/lessor in a sale-leaseback agreement with Xerox, the seller/lessee, of equipment constituting a so-called photo receptor line. The leaseback agreement (Lease Agreement) was for an initial eight year term, extending from January of 1985 through December of 1993.[1] Under the terms of the Lease Agreement, Xerox had the right to renew for two additional two year periods (January 1994—December 1995; and January 1996—December 1997), and then purchase back the leased equipment at the end of the renewal periods. *See* Lease Agreement at §§ 18, 19. The rent amount for the renewal periods (Fair Market Rental Value), as well as the repurchase price (Fair Market Value), were to be determined in accordance with an appraisal procedure set forth in the Lease which, if necessary, included retention of an independent, third party appraiser selected by the AAA. Lease Agreement at p. 2. The determination of the independent appraiser was to be "binding and conclusive on the Lessor and the Lessee." *Id.*

In accordance with the terms of the Lease Agreement Xerox timely exercised its right to renew for both renewal periods and also exercised its repurchase rights. However, the parties were unable to agree upon a renewal rent amount or repurchase price, and Sauer challenged many of Xerox' actions related to or arising out of the parties' efforts to establish such amounts. It is the activities surrounding the appointment of the independent appraiser and his final determination that are at the heart of this litigation. Before the appraisal process was concluded, Sauer commenced this lawsuit on July 20, 1995.

To date, six causes of action remain pending against Xerox: two breach of contract claims (causes of action one and three) and four claims sounding in fraud (causes of action two, four, five and eight).[2] Xerox asserts six counterclaims against Sauer: four breach of contract claims, a tortious interference claim, and a fraud claim.

Presently pending before me are three motions: Xerox' motion for summary judgment, Sauer's motion for partial summary judgment, and Xerox' motion to strike certain affidavits. Xerox moves for summary judgment dismissing all of Sauer's claims. Sauer cross-moves for partial summary judgment in his favor on his two breach of contract claims, and moves against all of Xerox' counterclaims. Finally, Xerox moves to strike certain affidavits submitted in support of Sauer's motion.

For the reasons stated below, Xerox' motion for summary judgment is granted in its entirety. Sauer's motion for partial sum-

---

1. Integrated Equipment Leasing Corporation (Integrated) was the original purchaser/lessor under the Lease Agreement. Sauer acquired all of Integrated's interests in the Lease Agreement in 1995.

2. Sauer has withdrawn his sixth and seventh causes of action. Sauer's Memorandum of Law filed February 27, 1997, at p. 20.

mary judgment and Xerox' motion to strike are denied in their entirety, as moot.

## I. *Sauer's Breach of Contract Claims*

### A. First Cause of Action—Breach of Contract for Failure to Pay Renewal Rent

This lawsuit was commenced on July 20, 1995. In his first cause of action, Sauer alleges that Xerox breached the Lease Agreement by failing to pay any renewal rent during the period following expiration of the Lease on December 31, 1993. Sauer seeks damages equal to the Fair Market Rental Value for the period January 1, 1994 through December 31, 1995, in an amount not less than $3,200,000.

Xerox moves to dismiss Sauer's first cause of action on the grounds that Sauer failed to adhere to the procedural requirements set forth the Lease Agreement—*i.e.,* providing notice and opportunity to cure—*prior* to asserting this claim. Additionally, Xerox asserts that the cause of action must be dismissed because as of July 1995 no renewal rent amount had been established and, thus, Xerox could not be in default for failure to pay an as yet undetermined amount. Finally, Xerox asserts that it has since paid the full Fair Market Rental Value amount, plus interest.

The Lease Agreement defines pertinent events, including a Default and an Event of Default. A Default is defined as being an event which "after the giving of notice or lapse of time, or both, would mature into an Event of Default." Lease Agreement at p. 3. For instance, with respect to renewal rent payments, an Event of Default occurs when the lessee fails to make payment within five days after receipt of notice that the payment is past due. *See* Lease Agreement at § 20(a).

Upon an Event of Default, the Lease Agreement sets forth the lessor's remedies. Section 21(a) of the Lease Agreement, states that

"[u]pon the occurrence of any Event of Default ... the Lessor may ... declare this Lease to be in default by written notice to such effect given to the Lessee,

and *at any time thereafter,* the Lessor may exercise one or more of the following remedies, as the Lessor in its sole discretion shall lawfully elect:

(i) Proceed by appropriate court action ... to enforce performance by the Lessee of the applicable covenants of this Lease or to recover damages for the breach thereof;

(ii) By notice in writing terminate this Lease, whereupon all rights of the Lessee to the use of the Leased Equipment ... shall absolutely cease and terminate...." (Emphasis added)

Thus, under Section 21(a) of the Lease Agreement the lessor is entitled either to sue to enforce the Agreement, or to terminate the Agreement, upon written notice of the lessee's Event of Default.

In his first cause of action, for the alleged failure to pay renewal rent, Sauer clearly seeks to enforce the Agreement and recover damages pursuant to § 21(a)(i) of the Lease. No attempt is made to terminate the Lease. However, prior to asserting this claim, Sauer not only failed to give Xerox timely written notice of an alleged Event of Default, as required by § 21(a), but no Event of Default, as defined in § 20, had even occurred.

It is undisputed that Sauer's only written notice to Xerox concerning Xerox' alleged failure to pay renewal rent came by letter dated July 21, 1995, one day after this suit was filed. In that letter Sauer notified Xerox that it had failed to make renewal rent payments for the period since January 1994, and that if not cured within five days, an Event of Default would occur. Thus, this written notice suffers from two impediments: because it was sent one day after suit was filed, it does not provide timely and proper written notice of Xerox' alleged Event of Default, as required by § 21(a) of the Lease Agreement. Moreover, as of that date no Event of Default, as defined in § 20(a) of the Lease Agreement, had yet occurred.

The Lease language is clear. Upon an Event of Default written notice is required *prior* to asserting a lawsuit. In this case Sauer not only failed to wait for an Event of Default to occur with respect to the renewal

rent, but he also failed to give written notice *prior* to asserting this lawsuit. Thus, Sauer's actions violated the clear terms of the Lease Agreement. Xerox had no reasonable opportunity to cure because it had no notice of Sauer's complaints until after he had sued.

It is well established under New York law[3] that "the terms of a written agreement define the rights and obligations of the parties to the agreement" and "where the parties have agreed to conduct themselves in a accordance with the rights and duties expressed in a contract, a court should strive to give a fair and reasonable meaning to the language used." *Abiele Contracting, Inc. v. New York City Sch. Constr. Auth.*, 91 N.Y.2d 1, 9–10, 666 N.Y.S.2d 970, 689 N.E.2d 864 (1997). Where, as here, the parties have agreed to provide notice and an opportunity to cure prior to suing for performance or asserting termination rights under a contract, those covenants must be adhered to. A party's failure to do so renders ineffective that party's rights to pursue those other remedies. *See Filmline (Cross–Country) Prod. Inc. v. United Artists Corp.*, 865 F.2d 513, 518 (2d Cir.1989)(where defendant failed to give timely notice and opportunity to cure, as required under agreement, subsequent attempt to terminate agreement was ineffective because it "did not conform with the Agreement")(citing *General Supply and Constr. Co. v. Goelet*, 241 N.Y. 28, 148 N.E. 778 (1925)); *see also Consumers Power Co. v. Nuclear Fuel Serv., Inc.*, 509 F.Supp. 201, 211 (W.D.N.Y.1981)(attempt to terminate contract invalidated for failure to comply with contract terms because "where the contract specifies condition precedent to the right of cancellation, the conditions must be complied with"). Based upon Sauer's failure to adhere to the notice and cure provisions set forth in the Lease Agreement I find that he is precluded from seeking remedies conditioned thereon.

Even absent this impediment, however, Sauer's actions were particularly rash and unjustified because while it is true that Xerox had not paid any renewal rent, Xerox had made repeated attempts to obtain a renewal rent figure from Integrated but no rental amount had been established. Indeed, the parties were in the last stages of determining that amount when Sauer abandoned those contractual provisions and commenced the lawsuit.

Xerox first notified Integrated of its interest in renewing the lease in April 1992. Van Nort Aff't at ¶ 8. This was twenty months before the renewal term was to begin. Beginning in early 1993, nearly a year before the renewal term was to begin, Xerox sought price quotes from Integrated for a renewal rent amount. Specifically, Xerox made several written offers to pay renewal rent amounts for both lease extension periods, as well as the final buyout amount. *See* Affidavit of Kenneth J. Van Nort (sworn to January 11, 1996) at ¶¶ 8,9,12,15, 22; February 2, 1993 letter from Van Nort, Ex. 11 to Affidavit of John P. Coffey (sworn to January 16, 1998) (Coffey Aff't) ("Please provide me with a quote, based on fair market value, for a twenty-four (24) month lease renewal of the remaining equipment."); April 7, 1993 letter from Van Nort, Ex. 12 to Coffey Aff't ("We propose to make a one time payment on January 1, 1994 that will both satisfy the two (2), two (2) year extension requirements and then allow us to exercise our end of lease purchase option .... In line with this proposal, please provide us with a one time price that will reflect the present value ... of all future payments ...."); Affidavit of Roland D. Nenni, Jr. (sworn to January 11, 1996) at ¶¶ 26, 31; August 3, 1994 letter from Nenni, Ex. 21 to Coffey Aff't (setting forth proposed renewal rent amounts and final buyout price).

Unable to mutually agree on an appropriate rental rate, starting in mid–1993, both Integrated and Xerox retained independent appraisers to valuate the equipment. Affidavit of Jeffrey Brodsky (sworn to January 9, 1998) (Brodsky Aff't) at ¶ 24; Xerox Statement of Facts at ¶ 23. Integrated retained the firm of Marshall & Stevens, Inc. Brodsky Aff't at ¶ 24. For reasons that are not entirely apparent, three successive Marshall &

---

**3.** The Lease Agreement expressly calls for application of New York law and the parties have relied upon New York law, without objection, throughout this proceeding.

Stevens appraisers were utilized by Integrated. The first was Ken Fowler, who visited the site of the photo receptor line and examined the equipment, but apparently never prepared an appraisal because he was replaced by David Love. Love too visited the site and examined the equipment. He issued an appraisal which was provided to Xerox in April 1994. Love appraised the Fair Market Value at $3,144,000 and the Fair Market Rental Value at $212,538. On May 31st, Xerox responded with appraisal figures calculated by its appraiser, James McGowan, who estimated the Fair Market Value at $875,535 and the Fair Market Rental Value at $32,312. Integrated then provided a new appraisal, by Ralph Page, the only Marshall & Stevens appraiser who did not examine the equipment. Page issued his appraisal on or about June 20, 1994, described by Integrated as a "new update." This appraisal was provided to Xerox. Page estimated the Fair Market Value at $5,993,512, and the Fair Market Rental Value at $1,144,933.

Because these appraisers disagreed on valuation amounts, and Integrated rejected Xerox' proposed renewal rent amount (see Exs. 21 and 22 to Coffey Aff't), the parties proceeded to the final stage of the appraisal process as required by the Lease Agreement—appointment by AAA of an independent appraiser (Charles Land). Xerox was awaiting Land's valuation when Sauer filed and served this lawsuit in July 1995.[4]

Under these circumstances, suing for nonpayment was certainly premature and appears to have been motivated by little more than anger and frustration with the appraisal process itself. Just because Sauer became disenchanted with the process, did not justify his unilateral decision to abort the procedure set forth in the Lease Agreement. *See, e.g., Olympia & York OLP Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 214 A.D.2d 509, 511–512, 626 N.Y.S.2d 69 (1st Dep't 1995)("A party to a dispute governed by an arbitration agreement may not unilaterally evade the stipulated forum and litigate the controversy"); *see also 99 Realty Co. v. Wall Street Transcript Corp.*, 165 Misc.2d 454, 632 N.Y.S.2d 742 (N.Y.Sup.App.1995)(finding that parties were bound by agreement to refer disagreement to alternative dispute resolution and therefore such determination was binding on them). "Parties provide for the appointment of appraisers because they want to rely on their expertise in settling vexatious problems. They make appraisal agreements final because they want to avoid litigation." *European—American Banking Corp. v. Chock Full O'Nuts Corp.*, 109 Misc.2d 615, 619, 442 N.Y.S.2d 715 (N.Y.Sup. app.1981). Sauer's actions in bringing this claim were at odds with his commitment under the Lease Agreement to reach a renewal rent amount through the prescribed appraisal process.

Finally, I note that since the date Sauer's lawsuit originally was filed, Sauer's claim has been further weakened by the fact that Xerox subsequently paid Sauer the full renewal rent amount for the 1994–1995 renewal period, as determined by the independent appraiser selected pursuant to the terms of the Lease Agreement. On December 28, 1995, Xerox paid Sauer $ 602,636.72, the sum of all past due Fair Market Rental amounts as determined by Charles Land, *plus* interest at 12.5%.

Sauer opposes Xerox' motion and cross-moves for summary judgment on his first cause of action. Sauer does not contest that notice of renewal rent nonpayment was not timely made. Instead, Sauer asserts that because of Xerox' numerous defaults (nonpayment of rent, failure to report events of loss and make casualty payments, and others) Xerox' attempt to renew for the second renewal period (January 1996–December 1997) was void, pursuant to § 18 of the Lease

4. Land completed his appraisal on August 14, 1995, estimating the Fair Market Value to be $993,125. At the request of both parties, he amended it (the second Land appraisal) the next day to include a Fair Market Rental Value of $550,000, based upon a two year renewal term. Then, at Xerox' request to consider Fair Market Rental Value over a four year term (two renewal periods), Land again amended his appraisal on September 8, 1995 (final Land appraisal), placing the Fair Market Rental Value at $275,000 per year for a four year period. Land's final appraisal also established that there would be a residual $200,000 value at the end of both renewal periods.

Agreement. Thus, Sauer alleges that the Lease expired by its own terms as of December 31, 1995 and Xerox has wrongfully possessed the equipment since that time.

This theory is totally at odds with Sauer's first cause of action. Sauer's first cause of action, for renewal rent nonpayment, seeks by its terms to enforce the Lease, not terminate it. Sauer now appears to seek a declaration that the Lease terminated by its own terms December 31, 1995, and Xerox' subsequent possession of the equipment constitutes unjust enrichment. This is wholly inconsistent with Sauer's pleadings. Nowhere in the first cause of action does Sauer seek a declaration that the Lease has been terminated or seek any remedies consistent with lease termination. Indeed, no such request is made anywhere in the Third Amended Complaint.[5] Thus, whether or not the Lease Agreement was terminated after December 1995 is irrelevant to Sauer's first cause of action, which by its terms seeks to enforce the Lease's renewal rent provisions for the period from January 1994 through December 1995.

Moreover, this Court finds that Sauer never has acted on his alleged belief that the Lease Agreement was terminated after December 31, 1995. The Lease Agreement sets forth certain actions Sauer was entitled to take upon "termination", including entering the premises where the equipment is kept and taking immediate possession, and also proceeding to sell or re-let the equipment in a commercially reasonable manner. *See* Lease Agreement at § 21(a)(ii). There is no evidence that Sauer has pursued either remedy. Sauer has suggested in letters to Xerox that Xerox should relinquish possession of the equipment, and he has further represented to this Court at oral argument that he has been unable to recover the equipment because he cannot gain access to it. However,

there is no evidence in the record that Sauer ever made any concerted effort to recover the equipment or sought the assistance of a court expressly to do so.

Importantly, Sauer has continued to accept and cash rental checks from Xerox for not only the first renewal period (1994–1995) but also the second renewal period (1996–1997), as well as for the final repurchase. While Sauer claims he has accepted such payments only in mitigation of damages, his actions belie any assertion that he genuinely believes the Lease Agreement has been terminated since January 1996 and that he has possessed legal ownership over the leased equipment since that time. In short, Sauer's actions have been inconsistent with any theory that the Lease Agreement expired by its terms after December 1995.

In sum, I find that Sauer's first cause of action, for renewal-rent-nonpayment, cannot be sustained. Sauer failed to abide by the terms of the Lease Agreement prior to asserting this claim; he acted rashly and improvidently by aborting the appraisal process set forth in the Lease Agreement; and his damages appear negligible due to the fact that Xerox has paid him the entire renewal rent amount as established by Land in accordance with the appraisal provisions set forth in the Lease Agreement, *plus* interest. Sauer cannot avoid this result by attempting an eleventh hour transformation of his cause of action into something he has neither pleaded nor acted upon. Sauer's first cause of action is dismissed.

**B. Third Cause of Action—Breach of Contract for Failure to Report Events of Loss and Pay Casualty Losses**

In Sauer's third cause of action, he alleges that Xerox breached the Lease Agreement

---

**5.** Sauer's general demand for an accounting of all profits received by Xerox since January 1996 does not, by itself, constitute a claim for a declaration that the Lease has been terminated or a claim for any assistance asserting termination rights. *See Daniels v. Thomas*, 225 F.2d 795, (10th Cir.1955)(the prayer for relief is no part of the cause of action, and parties are entitled only to such relief as the pleadings make out); *Cassidy v. Millers Cas. Ins. Co.*, 1 F.Supp.2d 1200,

1214, 1998 WL 162190 (D.Colo.1998)("the test of a complaint ... lies in the claim, not in the demand"). Nor does the mere introductory statement (¶ 86 of Third Amended Complaint) that on November 28, 1995, Sauer gave Xerox formal notice of Lease Termination. Sauer's attempts to amend his complaint to include a claim for conversion have been denied repeatedly by this Court. *See* Decisions dated January 1997, May 7, 1997 and May 30, 1997.

by failing to report Events of Loss, and pay for such losses. He seeks damages in an amount equal to the casualty loss value for all items as of the date of the loss.

Xerox seeks to dismiss this cause of action for the same reasons it sought to dismiss Sauer's first claim. First, Sauer has failed to comply with procedural prerequisites to suit. Additionally, as with Sauer's first cause of action, prior to instituting this action the allegedly correct casualty loss amount had not been established. Finally, since the action was initiated, Xerox has paid a casualty loss amount, with interest.

■ The Lease contemplates that upon an Event of Loss (destruction or devaluation of the leased items), the lessee must report said losses to the lessor and pay such "casualty value." See Lease Agreement at § 12. The parties hotly dispute whether the Lease requires that losses be reported and payments made for every individual piece of equipment lost or damaged, or only in the event that *all* pieces are damaged as the result of a catastrophic loss. However, I find that this dispute is irrelevant to resolution of the cross motions regarding Sauer's third cause of action. For the same reasons that Xerox' motion is granted as to Sauer's first cause of action, Sauer's third cause of action must be dismissed as well.

As set forth above, Sauer filed this lawsuit on July 20, 1995. As with Sauer's renewal-rent-nonpayment claim, Sauer's only notice to Xerox concerning Xerox' alleged failure to report Events of Loss and pay casualty losses was his letter sent on July 21, 1995. In that letter Sauer informed Xerox that Xerox had failed to pay casualty losses as required by the Lease and that, if not corrected within five days, an Event of Default would occur.

As with his first cause of action, Sauer's July 21, 1995 letter, coming one day after his lawsuit, failed to constitute proper notice of an Event of Default prior to asserting this claim, as required by § 21(a) of the Lease Agreement. Moreover, no Event of Default, as defined in § 20, yet existed.

Still another shortcoming exists: § 20 of the Lease Agreement provides that an Event of Default for failure to perform or observe any Lease covenant (other than failure to pay rent) occurs only when the failure has continued for 30 days after written notice thereof. Thus, Sauer's letter incorrectly stated that an Event of Default would occur after only five days.

For these reasons, Sauer's notice to Xerox was defective. As with Sauer's claim for renewal-rent-nonpayment, Sauer is not entitled to pursue the remedies provided in the contract because he failed to abide by the conditions precedent for such remedies. *See Filmline Prod.,* 865 F.2d at 518; *Abiele Contracting, Inc.,* 91 N.Y.2d at 9–10, 666 N.Y.S.2d 970, 689 N.E.2d 864.

Additionally, as with the renewal-rent claim, Sauer's actions initiating this cause of action were premature to say the least. At the time of the suit, Xerox had attempted to establish casualty loss values and did not deny that some casualty loss amount of money was due. Affidavit of Kenneth J. Van Nort (sworn to Jan. 11, 1996) at ¶ 9; February 2, 1993 letter from Van Nort, Ex. 11 to Coffey Aff't (identifying casualty losses of $130,631.98); Affidavit of Roland D. Nenni, Jr. (sworn to Jan. 11, 1996) at ¶¶ 26, 33; August 3, 1994 letter from Nenni, Ex. 21 to Coffey Aff't (proposing casualty loss payment of $120,389.18). Indeed, as recently as March 1995, Sauer told Xerox that its proposed casualty loss amount was "within the range of reason." March 22, 1995 letter from Sauer, Ex. 228 to Coffey Aff't. Moreover, Xerox eventually paid Sauer for casualty losses, *with interest.*[6] Thus, it does not appear that Sauer continues to have any legitimate claim for damages.

As with his claim for nonpayment, Sauer opposes and cross-moves, asserting that the Lease expired by its own terms in December 1995. For the same reasons discussed above, such argument fails: Sauer pleaded breach of contract, seeking to enforce a Lease covenant. Sauer did not seek to terminate the lease.

---

**6.** Indeed, since that time Xerox has concluded that under the terms of the Lease Agreement it did not owe *any* Casualty Loss payments to Sauer. While Xerox does not seek a disgorgement of these sums, it asserts that Sauer has gained a substantial windfall as a result.

For these reasons, Sauer's third cause of action is dismissed.

## II. Sauer's Fraud Claims

Sauer asserts four claims sounding in fraud. In his second, fourth, and fifth causes of action, Sauer alleges that Xerox made various misrepresentations to the appraisers in an effort to effect lower appraisal values. Specifically, Sauer alleges that Xerox failed to disclose certain equipment upgrades (second cause of action); failed to disclose the existence of a second photo receptor line (fourth cause of action); and failed to correctly identify the status of a certain component on the photo receptor line (fifth cause of action). He seeks damages in the amount of $3,200,000 on each of these claims.

In his eighth cause of action Sauer alleges that in 1985 Xerox falsely represented to Integrated that a certain piece of equipment—the "Egan Coater"—was new and qualified for the Investment Tax Credit, when it did not so qualify. Sauer evidently incorrectly took the ITC deduction on his 1985 tax return.[7] Nonetheless, Sauer seeks damages in the amount of $2,199.530 on this claim.

Xerox moves to dismiss each of these fraud claims on several grounds: despite extensive discovery, Sauer has uncovered no evidence that any Xerox employee ever made any of the alleged misrepresentations claimed by Sauer; furthermore, there is no evidence that anyone relied on the alleged misrepresentations; and many of the so-called misrepresentations are not relevant to the claims asserted in this lawsuit. Finally, Xerox asserts that Sauer's eighth claim, concerning alleged misrepresentations in 1985, is barred by the statute of limitations.

■ To sustain a cause of action for fraud a plaintiff must demonstrate that: (1) the defendant made a material false representation; (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damages as a result of such reliance. *See Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,* 57 F.3d 146, 153 (2d Cir. 1995). An additional element is required to state a claim based on fraudulent concealment—a duty to disclose. *Id.* A duty to disclose arises where (1) one party has superior knowledge of certain information; (2) that information is not readily available to the other party; and (3) the first party knows that the second part is acting on the basis of mistaken knowledge. *Id.* at 155. Under New York law, each element of a fraud claim must be shown by clear and convincing evidence.

■ I find that none of Sauer's fraud claims can survive. Despite extensive discovery there is no evidence, let alone clear and convincing evidence, that Xerox ever acted with the intent to deceive or defraud Sauer or anyone else. These claims appear to be little more than afterthoughts, bootstrapped to Sauer's original breach of contract action, arising out of Sauer's obvious disenchantment with the appraisal process and, specifically, the Fair Market Value and Fair Market Rental Value figures arrived at by Land. Because these figures were to be "binding and conclusive" on both parties, it is my view that Sauer has alleged numerous shortcomings with the appraisal process and with Xerox' actions, in order to attack the validity of these figures.

To the extent that Sauer believes the final Land appraisal is inaccurate or unfair because Xerox failed to conduct itself properly (or because Land failed to do the appraisal properly), the most appropriate remedy was to seek judicial intervention pursuant to New York's Civil Practice Law and Rules (CPLR) § 7601 at the time the appraisal process was proceeding or immediately thereafter. That statute provides that "a special proceeding may be commenced to specifically enforce an agreement ... that a question of valuation [or] appraisal be determined by a person named or to be selected." Under § 7601 a court can order specific performance of an appraisal, or enforce an agreement to ap-

---

**7.** While Sauer did not become a party to the Lease Agreement until 1995, he had purchased the same items of equipment from Integrated pursuant to a separate sale/leaseback agreement in 1985.

praise as if it were for arbitration under Article 75 of the CPLR. Additionally, because a court has greater control over appraisals than arbitration awards (*see European–American Banking Corp.*, 109 Misc.2d at 618, 442 N.Y.S.2d 715 (citations omitted)), an action brought under § 7601 during or immediately after the appraisal process was complete would have enabled the court to address and resolve all of Sauer's concerns regarding the validity of the process. *See Clark v. Kraftco Corp.*, 323 F.Supp. 358, 361 (S.D.N.Y.1971)("when reviewing an appraisal agreement, a court not only has the ... power to compel appraisal, but retains as well the authority to substitute itself for the appraisers or to enforce the agreement as if it intended the accoutrements [sic] of arbitration").

By coming into federal court, and repeatedly amending or attempting to amend his complaint over a period of nearly two years in an effort to include a variety of fraud and other tort claims, Sauer has misdirected his anger and unnecessarily complicated and protracted the resolution of his basic concerns about the appraisal process. This has been a costly expenditure of time and resources for all involved, and not a beneficial one. Having acquired Integrated's rights in the Lease Agreement, Sauer was obligated to abide by the Lease Agreement terms, including those which commit the lessor to the appraisal process and its results. Sauer should not be permitted to avoid his obligations by packaging his disagreements about or disappointments in the appraisal process as fraud claims and embroiling the parties in protracted federal court litigation. *See Hirschfeld Productions, Inc. v. Mirvish*, 218 A.D.2d 567, 630 N.Y.S.2d 726 (1st Dep't 1995)(rejecting plaintiff's attempt to avoid arbitration "by the artifice of appending incidental tort claims to a commercial dispute"), *aff'd*, 88 N.Y.2d 1054, 651 N.Y.S.2d 5, 673 N.E.2d 1232 (1996); *see also European–American Banking Corp.*, 109 Misc.2d at 619, 442 N.Y.S.2d 715 (parties "make appraisal agreements final because they want to avoid litigation").

Because I find that Sauer's fraud claims are little more than skirmishes related to the appraisal process contracted for in the Lease Agreement, and because there is no demonstrated evidence of fraud, all the fraud claims must be dismissed.

### A. Sauer's Second Cause of Action— Misrepresentations about Nonseverable Improvements (Upgrades)

■ In his second cause of action, Sauer alleges that in order to obtain a lower appraisal value, Xerox affirmatively misrepresented to the Marshall & Stevens appraisers and the AAA Appraiser (Land) that no upgrades (nonseverable improvements) had been made on the equipment. This, asserts Sauer, violated the express terms of Section 10(d)(ii) of the Lease Agreement, which provides in part that "[t]itle to any Nonseverable Improvement shall, upon installation ... vest in the Lessor.... If any such Nonseverable Improvement shall have a cost ... in excess of $75,000, the Lessee ... shall promptly furnish the Lessor with a full warranty bill of sale ... [and] give the Lessor at least 90 days prior written notice before any Nonseverable Improvement is made....."

By prior motion dated January 26, 1996, Xerox moved to dismiss this cause of action, pursuant to Fed.R.Civ.P. Rule 12(b)(6), on the grounds that the complained of conduct constitutes no more than breach of contract. In this Court's Decision and Order dated August 8, 1996, I declined to dismiss this claim on those grounds, finding that Sauer adequately had alleged more than mere failure to comply with the Lease Agreement, *i.e.*, Sauer alleged that Xerox had attempted affirmatively to deceive the appraisers. I also found, with respect to Sauer's claim of fraudulent concealment, that Sauer adequately had alleged that Xerox possessed unique and exclusive control of relevant information. Thus, I determined at *that* stage of the proceedings that Sauer had alleged an adequate factual basis to support his charges.

Now, after the benefit of discovery, I find that Sauer has not advanced his claim. The evidence generally shows that Xerox did disclose nonseverable improvements and the only evidence to the contrary is the result of improper conduct on the part of Sauer's attorney—which conduct has already been the

subject of sanctions by United States Magistrate Judge Jonathan Feldman.

Sauer's claim rests primarily on a statement in Land's second appraisal, where Land states that "it was necessary to rely on Xerox's personnel not only to identify the item, but also to indicate if there were any additions or improvements which inured to it. We were not told of any such improvements." Second Land Appraisal, Ex. 28 to Coffey Aff't, at p. 10.

The evidence shows that this statement was not accurate. In support of its motion, Xerox submits Land's deposition testimony explaining that this statement was "an error" and that "if there's any inference that Xerox was withholding that kind of information, the inference is wrong and wrongly taken." Deposition of Charles Land, 10/30/96 (Land Depo.), Ex. 58 to Coffey Aff't, at 332. Indeed, Land testified that "during the meetings upgrades had been mentioned" (id.) and that Xerox was "extremely willing to assist me and was holding nothing back." Id. at 304.

Why then the discrepancy? Xerox also has produced evidence that the erroneous statement appeared in Land's second appraisal as the result of an *ex parte* request by Sauer's own attorney. Sauer's attorney sent a fax to Land dated August 14, 1995, requesting that Land's report specify that he was "no[t] able to determine whether any 'improvements' had or had not been [sic] to the equipment and therefor assumed that no improvements had been made to any of the items." Ex. 30 to Coffey Aff't. Thus, the source of Sauer's claim of fraud is none other than Sauer's own attorney.

Moreover, Xerox discovered this only because Land had retained the August 14, 1995 facsimile and produced it to Xerox during his deposition. Sauer and his attorney had improperly failed to produce this document during discovery, a fact which resulted in Magistrate Judge Feldman imposing sanctions upon Sauer. *See* Order of United States

Magistrate Judge Feldman, dated June 9, 1997 ("[i]n fashioning relief for this conduct, the Court is mindful of plaintiff's evolving record of non-compliance with applicable rules ...").[8] Clearly, Sauer cannot sustain a claim for fraud which is based upon his own improper conduct.

Nor can Sauer's claim be sustained with respect to alleged misrepresentations made to Page, the Marshall & Stevens appraiser. Contrary to Sauer's allegations, the evidence suggests that Xerox did not deny the existence of nonseverable improvements. *See* Affidavit of Ralph Page (sworn to January 9, 1998) at ¶ 7 ("Mr. Nenni told that the only Nonseverable Improvement had been an upgrade to the LFE Profitmaster"). This does not constitute a blanket denial that any improvements were made.

Moreover, any alleged misrepresentations to Page ultimately are irrelevant to this litigation because it was the Land appraisal which became binding. Thus, Page's appraisal, and the events underlying it, are not critical.

Finally, Sauer suggests that if Page had been provided accurate information his appraisal might have been met with agreement by Xerox and avoided the necessity of seeking an independent appraisal. Sauer's argument makes no sense. If Page's appraisal were lower than appropriate, because of misrepresentations by Xerox, then Xerox would have been *more likely* to accept it. In fact, Xerox rejected Page's appraisal because it was too high. Thus, any information that allegedly would have made Page's appraisal even higher would *not* have saved the parties from moving to the next stage of appraisal—seeking an independent appraiser.

In short, the evidence does not support Sauer's claim of fraud with respect to nonseverable improvements. Indeed, Sauer has failed to respond in any way to the very serious charge that this claim is based predominately on conduct by him that has been sanctioned once already. Sauer continues to

---

**8.** I note that this was only one of three occasions on which Magistrate Judge Feldman sanctioned Sauer for discovery abuses. In addition to this occasion, Sauer also was sanctioned in March 1997 for failing to appear at his deposition (*see* 3/19/97 Order of Magistrate Judge Feldman) and again in September 1997 for failing to produce relevant, non-privileged documents. *See* 9/23/97 Order of Magistrate Judge Feldman.

impute unlawful motives to Xerox employees' actions without any support for such conclusions except his own belief that Xerox acted with unlawful intent.

This is insufficient at this stage of the litigation. Sauer can no longer sustain his fraud claim on unsubstantiated allegations alone. *See Markowitz v. Republic Nat'l Bank*, 651 F.2d 825, 828 (2d. Cir. 1981)("when a motion for summary judgment is made and supported ... the opposing party may not rest upon mere conclusory allegations or denials.... A plaintiff does not become entitled to a jury trial simply by asserting a cause of action in which the defendant's state of mind is a material element.... Some facts must be asserted to support the claim that the state of mind existed"); *Cavallo v. American Skandia Life Assur. Corp.*, 1997 WL 251538, *12 (S.D.N.Y.1997)(granting summary judgment dismissing fraud claim where "a reasonable jury could not conclude that plaintiff had proved by clear and convincing evidence either fraudulent misrepresentation or fraudulent concealment on the part of the defendant"); *see also Contemporary Mission, Inc. v. New York Times Co.*, 842 F.2d 612, 621 (2d Cir.1988)(in defamation action where defendant's state of mind is at issue, "a plaintiff opposing a fully supported [summary judgment] motion must offer 'concrete evidence from which a reasonable juror could return a verdict in his favor' ")(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

There simply is no evidence, let alone clear and convincing evidence, to infer fraudulent intent on the part of Xerox. Whether or not Xerox employees acted negligently, carelessly or even stupidly is not relevant. Such conduct would not constitute fraud. While Sauer has "muddied the water" with alleged factual issues, on close examination it becomes apparent that these alleged issues of fact are of no legal moment. Thus, his second cause of action—for fraud—is dismissed.

**B. Sauer's Fourth Cause of Action—Misrepresentations about A Second Photo Receptor Line**

In his fourth cause of action Sauer alleges that Xerox committed fraud by not informing the appraisers of the existence of a second photo receptor line, which Xerox operated separately from the photo receptor line at issue in this case. Sauer claims that this information would have been relevant to the appraisers because it would reveal the prices paid by Xerox for comparable equipment. Xerox does not deny that it never made this disclosure, but asserts that it had no obligation to do so.

I agree. Sauer cites no language in the Lease requiring Xerox to make such disclosure. Nor does he cite any other source of such obligation. By contrast, Xerox asserts that the express language of the Lease Agreement requires that an appraiser *not* consider this type of information.

The Lease Agreement states that Fair Market Rental Value and Fair Market Value "shall be determined on the basis of... the amount which would be obtainable in, an arm's length transaction between an informed and willing lessee [buyer] (*other than a lessee currently in possession*) under no compulsion to 'lease [buy] and an informed and willing lessor [seller] under no compulsion to lease [sell]." Lease Agreement at p. 4 (emphasis added). Xerox asserts that this language requires an appraiser to consider only open market transactions and *not* consider the individual resources and experiences of Xerox itself.

I agree with Xerox. The Lease language suggests that the appraiser of Fair Market Value and Fair Market Rental Value should ignore the lessee's existing needs or resources because such information would affect the price *that lessee* might be willing to pay for any given piece of equipment, as opposed to the value of such equipment on the open market.

By contrast, Sauer has provided no evidence whatsoever that Xerox had a duty to disclose this information. There is no language in the Lease Agreement suggesting that the appraiser is entitled to or should consider this type of information. Nor is there any evidence that Xerox knew Land (and Sauer) were relying on obtaining this information. Absent a duty to disclose, Xerox' failure to provide this information cannot

constitute a fraud (or even a breach of contract). *See Banque Arabe et Internationale v. Maryland National Bank,* 57 F.3d at 156.

As a matter of law, I find that Sauer's fourth cause of action is without merit. It is dismissed.

## C. Sauer's Fifth Cause of Action—Misrepresentations About the Status of the On–Line Electric Scanner.

■ In his fifth cause of action Sauer alleges that Xerox misrepresented to Land that a piece of equipment known as the scanner had been removed from the photo receptor line. Sauer asserts that this greatly devalued the scanner and resulted in a lower overall appraisal.

Xerox moves to dismiss this cause of action, asserting that all of Xerox' representations were accurate and also that the online/off-line status of the scanner was not relevant to Land's valuation. Xerox asserts that in accordance with the terms of the Lease Agreement the appraisers properly valued each piece of equipment individually, as if each were to be sold independently.

It is unnecessary for me to evaluate the terms of the Lease Agreement because I find that there simply is no evidence whatsoever that any Xerox agent made any knowingly incorrect statement for the purpose of obtaining a lower appraisal value. To the contrary. The only evidence suggests that Xerox accurately reported to Land that the scanner was partially on and partially off-line, and that Land made his valuation determination in accordance with what he believed was the correct method. *See* Land Depo. at pp. 309–10; Nenni Deposition at 530–31; Coffey Aff't at Ex. 40. Again Sauer provides no evidence supporting his claims. Based upon the evidence, it appears that Sauer's complaint is more properly directed to Land and his appraisal techniques, rather than an alleged unlawful act by Xerox, and as discussed above, that matter could have been reviewed in the context of an action brought pursuant to CPLR § 7601. There is no evidence supporting a fraud claim.

Additionally, there is no evidence that Xerox had a duty to disclose such information, *i.e.,* that Xerox possessed unique control and possession of it. Land had full inspection rights—he was permitted to view and inspect all pieces of equipment and he did so. Thus, the presence or absence of equipment from the photo receptor line would have been self evident. Without a duty to disclose no fraud cause of action can be maintained. *See Banque Arabe et Internationale,* 57 F.3d at 156; *see also Liberty Fabrics, Inc. v. Corporate Properties Assoc. 5,* 223 A.D.2d 457, 636 N.Y.S.2d 781 (1st Dep't 1996)(in action brought under CPLR § 7601, where real property appraiser examined each property prior to making valuation, claim that opposing party misrepresented condition of property to effect lower appraisal was without merit); *Arbitration between Jack Kent Cooke Inc. and Saatchi & Saatchi North America,* 222 A.D.2d 334, 635 N.Y.S.2d 611 (N.Y.A.D.1st Dept.1995)(where tenant had full inspection rights of landlords books for several years, court found that part of his claim for fraud in establishing annual rent adjustments was time-barred: "[o]ne to whom an allegedly false representation is made may not rely thereon if the means of obtaining the truth are available by the exercise of ordinary intelligence").

In short, there is no evidence that Xerox had the ability or the inclination to conceal any material information. Sauer's fifth cause of action must be dismissed.

## D. Sauer's Eighth Cause of Action—Misrepresentation about the Egan Coater

■ In his eighth cause of action Sauer alleges that, in 1985, Xerox misrepresented to Integrated the age of an item known as the Egan Coater. Specifically, Sauer alleges that Xerox represented that the Egan Coater was new, and thus qualified for the Investment Tax Credit, when in fact the Egan Coater was not new and did not so qualify. Sauer claims that he took the ITC for the 1985 tax year and, consequently, that "the people of the United States have been damaged" by Xerox' misrepresentation. Third Amended Complaint at ¶ 209. Additionally, Sauer alleges that Xerox made such a misrepresentation for the purpose of achieving a lower rental rate.

Xerox moves to dismiss this claim on various grounds including the fact that Sauer has

no damages and that the claim is foreclosed by the statute of limitations.

As an initial matter, it appears that Sauer benefitted from the ITC, and it does not appear that he faces any risk of prosecution by the IRS. *See* 26 U.S.C. § 6501 (an action for unintentional errors in the filing of a tax return must be commenced within three years from the date the return is filed). Thus, there is no threat to Sauer and no measurable damage to him.

■ Additionally, Sauer has adduced no evidence explaining why he or Integrated was prevented from discovering this alleged "fraud" within the six-year statute of limitations. Under the Lease Agreement, the Lessor had full inspection rights. Lease Agreement at § 11. Because the burden is on Sauer to demonstrate why he was unable to discover the alleged fraud within the limitations period, and he has offered no evidence whatsoever explaining his failure, this claim is time-barred.

■ Even if the merits of Sauer's allegations are considered, there is no evidence of intent to deceive. Sauer has seized upon a single sentence in the McGowan appraisal report (Xerox' retained appraiser) in which McGowan states that the leased equipment was used for two years prior to the date of the Lease Agreement. Sauer has concluded that either Xerox affirmatively lied to McGowan in 1994, in an attempt to receive a lower appraisal value, or that Xerox affirmatively lied to Integrated in 1985, in an attempt to obtain a lower rental rate. Xerox has explained the two year period as one where the equipment was 'debugged' and readied for productive service, which did not begin until 1995.

Sauer has not responded with any evidence whatsoever suggesting that representations made in 1985 or 1994 were intentionally deceptive. As with all of Sauer's other fraud claims, he has nothing other than his own unsupported and conclusory allegations to support such a claim. To defeat a well-supported summary judgment motion, this is not enough. *See Markowitz*, 651 F.2d at 828; *Cavallo*, 1997 WL 251538 at *12. For this

reason too the eighth cause of action must be dismissed.

### SUMMARY

In sum, Sauer has received from Xerox full renewal rent payments for both renewal periods, plus interest on those payments that were late. He also has received from Xerox the full purchase price to buy back the equipment. These amounts were determined by an independent, third party appraiser (Land), in accordance with the appraisal procedure outlined in the Lease Agreement. Additionally, Sauer has received Casualty Loss payments, in full, with interest.

Any alleged contract breaches by Xerox were long ago remedied, and Sauer's fraud claims are little more than attacks on the appraisal process itself, which more appropriately should have been addressed long ago in a state action brought pursuant to CPLR § 7601. None of his allegations rises to the level of a sustainable claim for fraud. In short, I find Sauer's entire action to be meritless.

There is no reason for this case to occupy the Court's docket and time any longer. "One of the functions of summary judgment is the 'avoidance of long and expensive litigation productive of nothing....'" *Markowitz*, 651 F.2d at 828 (citations omitted). This is just such a case. Sauer has had ample opportunity to demonstrate that Xerox has acted unlawfully and that he has suffered as a result. This he has failed to do. Sauer's personal frustration and disagreement with the results of the appraisal process chosen by the contracting parties has consumed this Court's time and resources, as well as those of both parties, long enough. He has no sustainable claims against this defendant in this Court. Sauer's third amended complaint must now be dismissed in its entirety, with prejudice.

### CONCLUSION

For all the above reasons, Xerox' motion for summary judgment is granted in its entirety. Sauer's motion for partial summary judgment and Xerox' motion to strike are denied as moot. Sauer's third amended com-

plaint is dismissed in its entirety, with prejudice.

IT IS SO ORDERED.