FILMLINE (CROSS–COUNTRY) PRO-DUCTIONS, INC. and Yellowbill Finance Limited, Plaintiffs–Appellees,

v.

UNITED ARTISTS CORPORATION, Defendant–Appellant.

No. 500, Docket 87–7647.

United States Court of Appeals, Second Circuit.

Argued Dec. 14, 1987.

Decided Jan. 12, 1989.

Robert S. Smith, New York City (Pamela M. Parker, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, of counsel), for plaintiffs-appellees.

Martin I. Shelton, New York City (Fran M. Jacobs, Shea & Gould, New York City, of counsel), for defendant-appellant.

Before MESKILL, KEARSE and MAHONEY, Circuit Judges.

MAHONEY, Circuit Judge:

This is an action for damages resulting from an alleged breach of contract. Defendants appeal from a judgment entered in the United States District Court for the Southern District of New York, John E. Sprizzo, *Judge*, awarding plaintiffs damages in the amount of $2,189,889 plus $869,900 in prejudgment interest after a trial without a jury. The opinion of the district court is reported at 662 F.Supp. 798 (S.D.N.Y.1987).

The subject matter of this suit is a letter agreement dated as of February 11, 1982 (the "Agreement"), as amended, between defendant United Artists Corp. ("UA") and plaintiffs Filmline (Cross–Country) Productions, Inc. ("Filmline") and Yellowbill Finance Limited ("Yellowbill") for the production of a film entitled "Cross Country" (the "Picture"). The Agreement called for Filmline to produce the Picture, with interim financing to be provided by Yellowbill, and obliged UA to purchase the Picture if Filmline produced it in accordance with the terms of the Agreement. Provision for the interim financing was made in a separate contract between Filmline and Yellowbill.

The Picture was produced, but UA acted to terminate the Agreement as production drew to a conclusion, asserting unacceptable variation from "an approved screenplay." The district court found that UA's stated reason for repudiating the contract was a pretext, the real reason being that UA sought to avoid a financial commitment to the picture. *Filmline*, 662 F.Supp. at 804. The district court held that while UA had a right to terminate prior to filming, it waived that right by failing to exercise it in a timely fashion and by participating in the actual filming of the picture. Thus, UA's later repudiation of its obligation to purchase and distribute the picture was deemed to constitute a breach of the contract. We affirm.

## Background

The basic events underlying this dispute are the formation of the Agreement between Filmline, UA and Yellowbill for the production of the Picture, an ensuing period during which the screenplay was revised, the actual filming of the Picture which began on May 11, 1982, and UA's repudiation of the Agreement on June 24, 1982 when the filming of the Picture was two days from completion. The Agreement provided that Yellowbill would finance the film, that Filmline would produce it, and that UA would purchase the Picture upon completion. Central to the case is UA's right of approval of the screenplay for the Picture under the Agreement.

Section 5 of the Agreement states that "UA shall have the following approvals with respect to the production of the Picture," specifying the director of the Picture, the screenplay writer, lead actors and actresses, the director of photography, the production designer and the film editor, but not the screenplay itself.[1] Section 2 of the

---

1. The Agreement incorporates UA's "Standard Terms and Conditions", Section 1.02(b) of which provides that: "No item subject to United's approval hereunder shall be deemed to have been approved by United unless United

Agreement, which deals with development of the screenplay, provides:

UA shall read and submit to [Filmline] such comments, if any, as it may have with respect to each draft of the screenplay. [Filmline] shall cause each draft of the screenplay to be rewritten in accordance with UA's suggested changes. The foregoing procedure shall be repeated until such time as UA and [Filmline] are satisfied with the final screenplay to be utilized for the production of the picture. UA and [Filmline] agree to accomplish the foregoing as promptly as reasonably possible so as not to frustrate the timely production of the Picture.

Section 15 of the Agreement states Filmline's obligation to produce the picture in conformity with the approved screenplay, and UA's resulting obligation to purchase, in the following terms:

Provided that the Picture shall be produced in strict conformity with the approved screenplay and story board (except only for such minor changes as may be required by the exigencies of production), and provided further that [Filmline] has performed all of its obligations hereunder and is not in breach of any representation, warranty, covenants or agreements hereunder, UA agrees to pay to [Filmline] upon full delivery of the Picture ... a sum ... in an amount equal to the final certified negative cost of the Picture ... up to the sum of Two Million Five Hundred Thousand Dollars ($2,500,-000)....

Similarly, Section 3(b) of the financing agreement between Filmline and Yellowbill provides that "the Film shall be based on the Script, as approved pursuant to the UA Agreement, except for minor deviations of the kind usual in the course of production of a film."

Section 4.01 of UA's "Standard Terms and Conditions" (the "Terms") provides in part:

In the event [Filmline] shall breach or become in default of performance of any material term, condition or covenant contained in this Agreement, or shall breach any representation or warranty contained in this Agreement, and shall fail to cure, correct or remedy such breach or default *within thirty (30) days after service of written notice specifying same,* ... United may:

(1) terminate this Agreement in its entirety and be relieved of any obligations to advance or cause to be advanced any further monies or to pay the Purchase Price for the Picture or any part thereof....

All rights and remedies to United under this agreement are cumulative and the exercise of one shall not limit or affect its right concurrently or subsequently to exercise any other rights or remedies as it may have at law, in equity, under this Agreement or otherwise.

Emphasis added.

Section 8.04 of the Terms states that "[t]his Agreement shall be construed and interpreted under the laws of the State of New York governing agreements which are wholly executed and performed therein."

UA entered into the Agreement based upon its evaluation of an initial draft of the screenplay. UA's agent in these activities was Charles Lippincott, vice president of acquisitions, who reviewed the initial screenplay and subsequent alterations. After reviewing the initial draft of the screenplay, Lippincott requested a number of alterations. On April 17, 1982, Lippincott met with Pieter Kroonenberg, one of the principals of Filmline, to discuss a revised draft of the screenplay dated April 13, 1982. Lippincott expressed his dissatisfaction with the April 13th screenplay and repeated requests for certain modifications. On April 19, 1982, UA (for whom Lippincott acted), Filmline and Yellowbill entered into an amendment (the "April Amendment") to the Agreement which provides in part:

This will confirm the approval by UA of the following elements:

(a) The April 13, 1982 revised screenplay, as further revised in accordance with the changes agreed to by UA and

shall have specifically approved the same in writing."

Filmline on April 17, 1982, provided that it is acknowledged that UA reserves the right to request minor changes to said screenplay prior to the confirmed May 11, 1982 start date of principal photography. . . .

The April Amendment also included approvals of the casting as to four characters, the "story board as to Scenes 1B through 35C," the director of photography, the production designer and the film editor (subject to the later enlistment of a supervisory film editor "at UA's request and subject to UA's approval").

Some revisions were made to the April 13 screenplay, resulting in a final screenplay, to be used for filming, dated May 7, 1982. Lippincott reviewed this final screenplay on May 11, 1982, which was also the date for commencement of filming. The district court determined that the May 7th screenplay did not make the orally agreed changes required by the April Amendment. Thus, after Lippincott's May 11th review, UA had the right to terminate the contract, subject to a thirty day right of cure by Filmline. Lippincott chose, however, not to give notice of termination. Instead, Lippincott actively participated in the filming, reviewing further revisions of the screenplay and appearing on the scene of shooting from May 11 to May 16 and June 1 to June 4. On several occasions, Lippincott assured plaintiffs that production was proceeding acceptably. Only on June 20, 1982, did Lippincott complain to plaintiffs that he did not believe that the picture was working out as he had hoped.

On June 24, 1982, independent developments within UA precipitated the termination. UA's senior management had evidently been misinformed as to the existence of a UA commitment to purchase the Picture. Discovery of the commitment by Lippincott's superiors was followed by a telephone conversation with Lippincott in which he apprised senior management of his growing pessimism about the commercial prospects for the film. Immediately thereafter, UA transmitted a termination notice to Filmline which stated in part:

It has come to our attention that (A) the Picture is not being produced *in strict conformity with the approved screenplay* and storyboard, (B) you have failed to perform certain of your obligations under the Agreement (including, without limitation, your obligation to obtain UA's approval as to certain production and creative elements and to fully and in good faith consult with UA as to certain other creative elements), and (C) you have breached certain of your representations, warranties, covenants and agreements contained in the Agreement (including, without limitation, the covenants relating to (A) and (B) above).

Based on the foregoing, this is to advise you that UA's obligations under the Agreement are hereby terminated and that US [sic] will not accept delivery of the Picture if and when completed. Nor will UA pay you the Cash Purchase Price (as defined in paragraph 15 of the Agreement) for the Picture in the event you attempt to tender delivery of the completed Picture to UA.

Emphasis added.

UA's purported notice of termination included no provision for Filmline to cure, correct or remedy its asserted defaults. Filmline's counsel responded promptly in writing, denying any breach on Filmline's part and contending that UA's purported notice of termination was itself an anticipatory breach of the Agreement.

Filmline and Yellowbill subsequently arranged for alternate distribution, but the Picture was a commercial failure. On January 26, 1983, Filmline and Yellowbill commenced the instant litigation. Prior to the trial of the case, the district court denied a motion by UA to dismiss or stay the action in favor of a California state court action initiated by UA, or alternatively for a transfer of the action to the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1404(a) (1982). After trial, the district court ruled that UA had waived its right to terminate for failure of the screenplay to conform with the provisions of the April Amendment, determined the various damages is-

sues tendered by the parties, and concluded that UA was liable to Filmline and Yellowbill in the amount of $2,189,889, plus prejudgment interest on that amount from January 26, 1983. This appeal followed.

### Discussion

It is undisputed that this diversity action is governed by New York law. Indeed, as noted earlier, Section 8.04 of the Terms explicitly so provides.

### A. Breach of Contract.

UA's purported notice of termination specified that the Picture was "not being produced in strict conformity with the approved screenplay and storyboard...." Both at trial, see *Filmline*, 662 F.Supp. at 804, and on appeal, however, UA contended that there was never an approved screenplay, because the requirement stated in the April Amendment that the screenplay be "further revised in accordance with the changes agreed to by UA and Filmline on April 17, 1982" had never been fulfilled. UA contends that it allowed Filmline to go forward with screening of the Picture and attempt to bring it into conformity with "the changes agreed to by UA and Filmline on April 17, 1982," and legitimately terminated the Agreement and UA's responsibilities thereunder when Filmline failed in that attempt. The district court rejected that position, concluding that New York law required an election by UA either to terminate on May 11, 1982, prior to the inception of filming, or to waive the breach that had by then become manifest and continue performance under the contract. *See Filmline*, 662 F.Supp. at 804–05 (citing *Emigrant Indus. Savings Bank v. Willow Builders, Inc.*, 290 N.Y. 133, 145, 48 N.E. 2d 293, 299 (1943); 5 Williston on Contracts § 683, at 270 (3d ed. 1961); and *Apex Pool Equip. Corp. v. Lee*, 419 F.2d 556, 562 (2d Cir.1969)).

We concur in the district court's general view of New York law. UA, however, cites to us New York authorities which mitigate the rigor of this rule. *Lenkay Sani Products Corp. v. Benitez*, 47 A.D.2d 524, 362 N.Y.S.2d 572 (2d Dep't 1975), is typical. In *Lenkay*, machines were delivered which did not function properly, and the buyer offered the manufacturer an opportunity to remedy the defects. When this effort failed, the buyer sued to recover the partial payments it had made for the machinery, and the manufacturer counterclaimed for the balance of the purchase price, claiming acceptance by the buyer and waiver of the defects. The Appellate Division rejected this contention, stating:

> Where a buyer has knowledge that the goods do not conform to the contract specifications, but nevertheless accepts them, he may revoke his acceptance and rescind the contract if the acceptance was on the reasonable assumption that the nonconformity would be seasonably cured, but cure was not effected. ([Uniform Commercial Code], § 2–608, subd. [1], par. [a]).

47 A.D.2d at 525, 362 N.Y.S.2d at 573.

Although this decision was premised upon a specific provision of the Uniform Commercial Code, other New York cases apply the principle more broadly. *See, e.g., Richard v. Credit Suisse*, 242 N.Y. 346, 352, 152 N.E. 110, 111–12 (1926) ("[r]escission is not barred because indulgence has been shown"); *Schenck v. State Line Tel. Co.*, 238 N.Y. 308, 312–13, 144 N.E. 592, 593–94 (1924) (bringing of action to recover damages which was barred by limitations did not constitute an election barring later action for rescission); *City School Dist. v. McLane Constr. Co.*, 85 A.D.2d 749, 751, 445 N.Y.S.2d 258, 261 (3d Dep't 1981) (acceptance of defective beams upon assurance that defects would be cured not a waiver; no mention or citation of Uniform Commercial Code).

We applied this rule in *S.D. Hicks & Son Co. v. J.T. Baker Chemical Co.*, 307 F.2d 750 (2d Cir.1962), a diversity case governed by New York law. In that case, defendant undertook to construct a chemical processing plant and guaranteed its performance. Defendant then sought additional compensation for bringing the finished plant into compliance with the guarantee, contending that the buyer's initial acceptance of the

plant constituted a waiver of the guarantee. We rejected that contention, stating:

> [T]here is no warrant for the position that a party to a contract waives his rights under the contract by failing to insist upon performance at the due date and by urging and encouraging the other party to perform thereafter.

*Id.* at 752 (citations omitted).

■ We would have some difficulty in applying the rule for which UA contends to the facts of this case, given the equivocal conduct of the parties at the inception of the shooting of the Picture, and the foreknowledge of all parties that Filmline would incur the bulk of its expense in performing the Agreement by shooting the Picture. We deem the inquiry mooted, however, because even on the assumption that Filmline was in breach and UA was entitled to terminate when it purported to do so on June 24, 1982, it is clear that UA's notice of termination did not conform to the Agreement and was therefore ineffective under New York law.

Specifically, UA's purported notice of termination made no effort to comply with the explicit requirement, stated in section 4.01 of the Terms, that Filmline was to be accorded an opportunity "to cure, correct or remedy such breach or default within thirty days of written notice specifying same...."[2] Under New York law, that defect is fatal to UA's position.

In *General Supply and Constr. Co. v. Goelet*, 241 N.Y. 28, 148 N.E. 778 (1925), *remittitur amended*, 241 N.Y. 507, 150 N.E. 532 (1925), the defendant purported to terminate a contract for the construction of a building. As the court described it, the contract provided "that the owner might terminate the contract at any time upon certificate of the architect that the work was being unreasonably delayed and that such delay was sufficient ground for termination of the contract." 241 N.Y. at 34, 148 N.E. at 779. Rejecting the owner's purported termination of the contract without obtaining the contractually required certificate, the Court of Appeals stated:

> Though [the owner] may have been justified ... in his belief that the contractor would not thereafter mend his ways and finish the work within a reasonable time, yet where such delay did not amount to abandonment [the owner] could not rescind the contract for that reason, *except according to its terms....* Having indicated purpose to keep the contract alive in spite of delays on the part of the contractor, the owner could not suddenly abandon the purpose and treat as essential an element of the contract which he had previously waived, as ground for termination. The termination of the contract in this case without the required previous notice and without a certificate from the architect *in accordance with the terms of the contract* was wrongful.

241 N.Y. at 24, 148 N.E. at 779 (emphasis added) (citations omitted); *accord: Scordley v. Olsher*, 18 Misc.2d 424, 186 N.Y.S.2d 883 (App.Term 1959).

The rule of *General Supply* was applied in *Consumers Prod. Co. v. Nuclear Fuel Services, Inc.*, 509 F.Supp. 201 (W.D.N.Y. 1981), where the contract between the parties required that prior to termination, "the parties shall attempt to agree on an equitable [price] adjustment," but could terminate if the effort did not succeed "within sixty days." *Id.* at 211. The court invalidated an attempt to terminate without undertaking adjustment negotiations, stating:

> Under New York law, ... [w]here the contract specifies conditions precedent to the right of cancellation, the conditions must be complied with. *General Supply and Construction Co. v. Goelet*, 241 N.Y. 28, 148 N.E. 778 (1925).

*Id.*

We note that we are at variance with the district court in ruling that UA's failure to give Filmline an opportunity to cure was a fatal defect under New York law. The district court stated that:

> [O]n June 24 Filmline did not ... have the artistic or financial capacity to prop-

---

**2.** UA contends that this explicit requirement, stated in a document drafted by UA, was rendered nugatory by the further provision in Section 4.01 that UA's rights and remedies under the Agreement are cumulative. The contention is, at best, frivolous.

erly revise the screenplay as requested by UA within thirty days. Therefore, UA's failure to give an opportunity to cure is of no consequence here. *Cf. Allbrand Discount Liquors v. Times Square Stores Corp.*, 60 A.D.2d 568, 399 N.Y.S. 2d 700 (2d Dep't 1977).

*Filmline,* 662 F.Supp. at 804 n. 6.

*Allbrand* held only that a lessee who intended to operate a liquor store on the leased premises need not undertake the "futile" act of applying for a liquor license when the lessor had advised the lessee that it would in no event be allowed to take possession. Here, on the contrary, deposition testimony of Lippincott which was in evidence indicates that it might have been far from futile to have required Filmline to adapt the screenplay within thirty days. Lippincott testified:

> Q. Had you stated your objections to the film assemblage that you saw on June 22nd, would it have been possible for any changes to have been made?
>
> . . . . .
>
> THE WITNESS: It would have been pretty difficult.
>
> . . . . .
>
> Q. Why is that?
> A. Because it would have meant rewriting and reshooting the film.
> Q. How much work would that have entailed?
> A. A great deal of work.
> Q. Can you give me an estimate in terms of time?
> A. *I would say including writing and reshooting three to four weeks.*

Emphasis added.

We conclude that on this record, New York courts would apply the clear New York rule requiring termination of a contract in accordance with its terms, rather than the quite limited *Allbrand* exception

to which the district court deferred. Accordingly, since UA's purported termination was in violation of the terms of the Agreement, it was inoperative and plaintiffs are entitled to recover for breach of contract.

The district court reached this result by a different route, concluding that by allowing the filming of the Picture to proceed on May 11, 1982, UA waived Filmline's failure to conform the Picture to the requirements of the April Amendment.[3] As indicated earlier, we do not deem it necessary to resolve the waiver issue. That is, we conclude that whether or not UA waived Filmline's failure to conform the screenplay to the requirements of the April Amendment, UA's purported notice of termination dated June 24, 1982 was in any event ineffective under New York law because it did not comply with the Agreement. It is settled that we may affirm on any basis that is supported by the record, regardless of the ground upon which the trial court relied. *See Helvering v. Gowran,* 302 U.S. 238, 245, 58 S.Ct. 154, 157, 82 L.Ed. 224 (1937); *United States v. Lieberman,* 637 F.2d 95, 103 n. 11 (2d Cir.1980).

**B. *Damages.***

 UA contends that the district court vastly overstated the damages properly recoverable, assuming a breach of contract. Specifically, UA argues that the district court erroneously rejected UA's contention that "the plaintiffs' damages must be reduced by the amount it would cost plaintiffs to reshoot the entire Picture in strict conformity with the May 7 screenplay." *Filmline,* 662 F.Supp. at 811. The district court concluded that "[h]ad UA not wrongfully terminated the contract, UA would have and in good faith could have only required Filmline to conform to the May 7 screenplay the eleven scenes which [UA] actually preferred in the May 7 version,"

---

**3.** The district court also found that UA's purported notice of termination was pretextual, although not relying upon that finding for its conclusion as to liability. This finding was amply supported by the record, especially by testimony from an arbitration to which UA was a party, introduced into evidence at the trial below, which demonstrated that UA's notice of termination was motivated by a desire to extri-

cate UA from its obligations under the Agreement when UA's senior management belatedly learned its provisions on or about June 24, 1982. Again, in view of the failure of UA's purported notice of termination to comply with the requirements of the Agreement, we need not reach the question whether a pretextual motivation might in some circumstances invalidate an otherwise effective termination.

*id.* at 815, at a cost of $20,901. These determinations are not clearly erroneous, and are accordingly affirmed.

We also concur in the district court's detailed consideration of the numerous other damage issues which were proferred by the parties, *see id.* at 806–14, and in its conclusion (not specifically challenged by UA) that prejudgment interest should be awarded as of the date of the commencement of this action, January 26, 1983, pursuant to N.Y.Civ.Prac.L. & R. 5001 (McKinney 1963). *Filmline*, 662 F.Supp. at 815 (citing *Morse v. Swank, Inc.*, 520 F.Supp. 829, 829–30 (S.D.N.Y.1981), *aff'd sub nom. Morse v. S.A.R.L. DeGestion Pierre Cardin*, 688 F.2d 816 (2d Cir.1982)).

## C. *Change of Venue.*

UA also claims that the district court's denial of UA's motion to transfer the action to the Central District of California was an abuse of discretion. Change of venue is governed by 28 U.S.C. § 1404(a) (1982), which provides: "For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

The determination whether to grant a change of venue requires a balancing of conveniences, which is left to the sound discretion of the district court. *Carlenstolpe v. Merck & Co., Inc.*, 819 F.2d 33, 35 (2d Cir.1987) (forum non conveniens); *Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 218–19 (2d Cir.1978), *cert. denied,* 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979). That discretion will not be disturbed upon appeal without a clear showing of abuse. *A. Olnick & Sons v. Dempster Bros. Inc.*, 365 F.2d 439, 443–44 (2d Cir.1966).

A challenge to a venue determination, furthermore, is usually made by a pretrial request for mandamus. *See Carlenstolpe,* 819 F.2d at 34–35; *Olnick,* 365 F.2d at 442–43. Here, on the contrary, UA made no effort to obtain pretrial review, but now seeks a new trial because of an allegedly improper refusal to grant a change of venue. As we have said, however, such a ruling "is almost impossible to correct by review after trial." *Olnick,* 365 F.2d at

444; *see Kasey v. Molybdenum Corp. of Am.*, 408 F.2d 16, 20 (9th Cir.1969); 15 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3855, at 473–74 (1986). Rather, as we stated in *Ford Motor Co. v. Ryan*, 182 F.2d 329, 330 (2d Cir.), *cert. denied,* 340 U.S. 851, 71 S.Ct. 79, 95 L.Ed. 624 (1950), "should [the movant] ... finally lose on the merits below, any error in the interlocutory order [denying a change of venue] would probably be incorrectible on appeal, for [the movant] could hardly show that a different result would have been reached had the suit been transferred."

In any event, wholly aside from the procedural posture of this case, no showing has been made that the district court abused its discretion in denying UA's motion for a change of venue. UA's claim is that Lippincott was susceptible to subpoena in the Central District of California, to which transfer was sought, but not in New York, and UA was therefore required to rely upon the deposition testimony of a crucial witness at trial. UA stresses that the convenience of witnesses is an expressly stated consideration in section 1404(a), and that this is "[p]robably the most important factor" in deciding an application under that section. 15 C. Wright, A. Miller & E. Cooper § 3851, at 415 (1986).

No particular prominence was accorded to Lippincott, however, in UA's motion papers seeking a change of venue; he was simply listed twice as one of a number of California witnesses whose convenience would be served by a California trial. Filmline and Yellowbill made similar assertions as to New York being a more convenient locale for their witnesses. Furthermore, the district court was entitled to give some weight to the fact that the Agreement called for its construction and interpretation in accordance with New York law. *See id.* § 3854, at 466–68; *see also Van Dusen v. Barrack*, 376 U.S. 612, 645, 84 S.Ct. 805, 824, 11 L.Ed.2d 945 (1964) (trial in state in which "federal judges are more familiar with the governing laws" a factor to be considered in determining motion for a change of venue).

We conclude that the district court did not abuse its discretion, and certainly com-

mitted no error reversible at this juncture in the litigation, by denying UA's motion for a change of venue. On the contrary, the district court was entitled to conclude that UA had failed to carry its "burden of making out a strong case for a transfer." *Ford Motor Co. v. Ryan*, 182 F.2d at 330.

### Conclusion

The judgment of the district court is affirmed.