**ROCKLAND EXPOSITION, INC., Plaintiff,**

v.

**ALLIANCE OF AUTOMOTIVE SERVICE PROVIDERS OF NEW JERSEY, Tom Elder, Thomas Greco Publishing, Inc. and Glenn Villacari, Defendants.**

**Case No. 08–CV–7069 (KMK).**

United States District Court, S.D. New York.

Nov. 5, 2009.

See also 2009 WL 1154094.

Philip Furgang, Esq., Stephanie Furgang Adwar, Esq., Furgang & Adwar, L.L.P., New York and West Nyack, NY, Armando Llorens, Esq., Law Offices of Armando Llorens, Suffern, NY, for Plaintiff.

Arthur M. Peslak, Esq., Mandel & Peslak, LLC, Freehold, NJ, Benjamin Zelermyer, Esq., Law Offices of Wesley Chen, New York, NY, Thomas Anthony Catalano, Esq., Lester, Schwab, Katz and Dwyer LLP, New York, NY, for Defendants.

*OPINION AND ORDER*

KENNETH M. KARAS, District Judge:

Plaintiff Rockland Exposition, Inc. ("Plaintiff" or "REI") brings this action against Defendants Alliance of Automotive Service Providers of New Jersey ("AASP"), Tom Elder, Thomas Greco, Thomas Greco Publishing, Inc., and Glenn Villacari (collectively, "Defendants"). Plaintiff alleges trademark infringement, tortious interference with contract, unfair competition, copyright protection, and breach of contract. Plaintiff now moves for partial summary judgment, asking this Court to find that a valid contract still exists between it and AASP. Defendants oppose this motion and cross-move for summary judgment, insisting that AASP's termination of the contract relieves AASP of any obligations under the contract after an automotive show in 2009. For the forgoing reasons, this Court denies REI's motion, and grants AASP's motion.

## I. Background

This Court has extensively described the factual background and procedural history of this case in a prior opinion. *See Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers of N.J.,* Nos. 08–CV–7069, 08–CV–11107, 2009 WL 1154094, at *1–*4 (S.D.N.Y. Mar. 19, 2009). Here, it will only highlight those facts which are relevant to the pending motions. In or around 1989, AASP entered into an agreement with REI to manage and promote an auto-motive/autobody trade show (the "Northeast Trade Show") in exchange for AASP's endorsement and sponsorship. *Id.* at *1. Between 1990 and 2008, REI managed the annual Northeast Trade Show. *Id.*

In 2004, REI and AASP entered into a contract covering the 2005 and 2006 Northeast Trade Shows. (Affirmation of Philip Furgang (Furgang Aff.), Ex. B. ("the Contract").) The Parties did not execute a new agreement in 2005, or 2006, but AASP provided REI with a $2000 deposit for each of the 2007 and 2008 Northeast Trade Shows. *See Rockland Exposition, Inc.,* 2009 WL 1154094, at *2. The Contract's provision for its renewal and discontinuation have been the subject of much dispute, giving rise both to today's ruling and that of March 19, 2009. That portion of the Contract (modified to cover the relevant time period) provides as follows:

> AASP[ ] further agrees that after reviewing the [2008] show report and the estimated proposal for the following years [sic] event they must within 45 working days of the close of the [2008] show, either submit $2000.00 deposit to [REI] to hold the [2010] show dates or they must serve written notice by registered mail that they wis[h] to discontinue this agreement after the [2009] event. It is further agreed that AASP[ ] will not be involved in or endorse any other related exposition four months prior or four months after the latest contracted exposition.

(Contract 2–3.) Following the March 2007 show, relations between REI and AASP began to deteriorate, largely because of AASP's concern about REI's management of the show. *See Rockland Exposition, Inc.,* 2009 WL 1154094, at *2. At a July 2007 meeting to discuss AASP's concern, REI gave AASP a memorandum requesting a "written decision" from AASP about its willingness to participate in the 2009 and 2010 shows by March 31, 2008. *Id.* REI also proposed a new arrangement which provided for a higher deposit from AASP and contained different payment terms. *Id.* After the meeting, REI sent a follow-up letter to AASP asking AASP to confirm (by fax or email) its willingness to participate in shows after the March 2008 show (which AASP already had agreed to do with REI) by March 31, 2008. *Id.*

On March 27, 2008, just prior to the 2008 show, AASP sent REI a letter proclaiming that "the contract has expired" and that "[y]ou have been notified that the upcoming event will be the last one held through your company for the present and foreseeable future." (Furgang Aff. Ex. C.); *see also Rockland Exposition, Inc.,* 2009 WL 1154094, at *3. The day after the 2008 show ended, March 31, 2008, AASP sent REI another letter, this time stating that "AASP[ ] has elected to sever its business relationship with Rockland Exposition, Inc., and will not be entering into any agreements with you involving its planned 2009 Trade Show." (Furgang Aff. Ex. D.)

REI thereafter initiated this suit. In response to REI's first motion for partial summary judgment, Defendants argued that AASP's March 2008 letters, which had been requested by REI, relieved it from any obligation to participate in the 2009 show. *See Rockland Exposition, Inc.,* 2009 WL 1154094, at *12. This Court disagreed, finding that "the 2004 Agreement would automatically renew and that advance, written notice of termination would be required to terminate the agreement and, thereby, suspend automatic renewal." *Id.* at *7. The Court then ruled that, because AASP's notice was not given within forty-five days of the 2007 show, "it was contractually obligated to sponsor the 2009 trade show under REI's management." *Id.* at *9. The Court also held that AASP breached the Contract's non-compete clause by promoting its own 2009 show while still under contract with REI. *Id.* at *9.[1] But, the Court denied REI's request for specific performance, refusing to order AASP to participate in REI's 2009 show or to comply with the non-compete clause. *Id.* at *15. Instead, the Court decided that damages were suffi-

cient to right those wrongs, particularly because AASP had relied on REI's representations that it could opt-out of any post–2008 contractual obligations if it did so by March 31, 2008. *Id.* at *11–*15.

## II. Discussion

### A. Standard of Review

#### 1. Summary Judgment

Summary judgment may be granted where it is shown that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.,* 352 F.3d 775, 780 (2d Cir.2003); *see also Tufariello v. Long Island R.R. Co.,* 458 F.3d 80, 85 (2d Cir.2006) (noting that a court must draw all reasonable inferences in the nonmovant's favor).

A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Atl. Mut. Ins. Co. v. CSX Lines, L.L. C.,* 432 F.3d 428, 433 (2d Cir.2005). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim. In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser*

---

1. The non-compete clause states that AASP "will not be involved in or endorse any other related exposition four months prior or four months after the latest contracted exposition." (Contract 3.)

*Co.*, 536 F.3d 140, 145 (2d Cir.2008) (internal citations omitted). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (footnote omitted); *see also McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n. 4 (2d Cir.2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."). A fact is material when "it might affect the outcome of the suit under governing law." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir.2007) (internal quotation marks omitted). At summary judgment, a court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial. *See Westinghouse Elec. Corp. v. N.Y. City Transit Auth.*, 735 F.Supp. 1205, 1212 (S.D.N.Y.1990). A court's goal should be to "isolate and dispose of factually unsupported claims." *Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548.

### 2. Contract Interpretation

 The Contract contains a New York choice-of-law provision, and the Parties do not dispute that New York law applies to Plaintiff's breach of contract claim.[2] *See Postlewaite v. McGraw–Hill, Inc.*, 411 F.3d 63, 67 (2d Cir.2005) (applying New York law where "[t]he parties do not dispute that New York law applies"). "Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed." *Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir.2000) (citing *Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 413 N.Y.S.2d 352, 385 N.E.2d 1280, 1282

(1978)). Thus, the Court's analysis properly starts with the four corners of the Contract to determine whether it is unambiguous. *See RJE Corp. v. Northville Indus. Corp.*, 329 F.3d 310, 314 (2d Cir.2003) (" 'Where a contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence.' ") (quoting *De Luca v. De Luca*, 300 A.D.2d 342, 751 N.Y.S.2d 766, 766 (2002)); *Terwilliger*, 206 F.3d at 245 ("[M]atters extrinsic to the agreement may not be considered when the intent of the parties can fairly be gleaned from the face of the instrument.") (citing *Teitelbaum Holdings, Ltd. v. Gold*, 48 N.Y.2d 51, 421 N.Y.S.2d 556, 396 N.E.2d 1029, 1032 (1979)). The ultimate determination of the parties' intent depends on the text of the contract at issue and not on the fact that the parties urge different interpretations of the contract. *See Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir.1990) ("Language whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation.") (citations omitted); *O.D.F. Optronics Ltd. v. Remington Arms Co.*, No. 08–CV–4746, 2008 WL 4410130, at *11 (S.D.N.Y. Sept. 26, 2008) (" 'The language of a contract is not made ambiguous simply because the parties urge different interpretations.' ") (quoting *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir.1992)).

 With respect to a contract claim, a court may grant summary judgment when the contractual language is " 'plain and unambiguous.' " *Zurich Am. Ins. Co. v. ABM Indus., Inc.*, 397 F.3d 158, 164 (2d Cir.2005) (quoting *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 148 (2d Cir.

---

**2.** The Contract states: "All disputes under the agreement shall be resolved according to New York State Law." (2004 Agreement 3.)

1993)); *see also Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir.1989) ("Contract language is not ambiguous if it has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" (quoting *Breed*, 385 N.E.2d at 1282) (alteration in *Hunt*)). Therefore, if the contract is unambiguous, then its construction is a question of law. *See Metro. Life Ins.*, 906 F.2d at 889 ("Under New York law ..., if a contract is unambiguous on its face, its proper construction is a question of law."). However, "unless the moving party can establish that contractual language is not 'susceptible of at least two fairly reasonable meanings,' a material issue exists concerning the parties' intent, and the non-moving party has a right to present extrinsic evidence regarding the meaning of the contested term." *Wards Co. v. Stamford Ridgeway Assocs.*, 761 F.2d 117, 120 (2d Cir.1985) (internal citation omitted) (quoting *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir. 1983)); *accord Hoyt v. Andreucci*, 433 F.3d 320, 331–32 (2d Cir.2006); *United Indus. Corp. v. IFTE plc*, 293 F.Supp.2d 296, 300 (S.D.N.Y.2003).

## B. Analysis

REI brings a second motion for partial summary judgment. In the first motion, REI successfully argued that AASP's March 2008 notice of termination was ineffective to terminate the Contract prior to the 2009 show. This time, REI contends that AASP's March 2008 notice was ineffective to terminate the Contract prior to the *2010* show. (Pl. Rockland Exposition, Inc.'s Mot. for Partial Summ. J. ("Pl.'s Mem."), at 2.) REI relies on four provisions of the Contract, each of which is quoted above. First, the Contract requires that, in order to terminate it prior to the 2010 show, AASP must have in-

formed REI, within forty-five days of the 2008 show, that it wished "to discontinue the agreement *after* the [2009] show." (Pl.'s Mem. 4 (quoting Contract 2) (emphasis supplied by REI).) Yet, AASP's March 2008 notice purported to terminate the Contract immediately, that is, *before* the 2009 show. (Pl.'s Reply to Defs.' Opp'n to Pl.'s Mot. For Summ. J. and Opp. to Defs.' Cross–Mot. for Summ. J. ("Pl.'s Reply Mem."), at 4–5.) Second, the non-compete provision, according to REI, is a "condition precedent" to effective termination of the Contract. (Pl.'s Reply Mem. 5.) Thus, AASP's violation of the non-compete clause does not merely constitute a breach of the Contract, but actually causes the Contract to be automatically renewed. (*Id.*) Third, the Contract states that "AASP[ ] further agrees that after reviewing the [2008] show report and the estimated proposal for the following year's event they must within 45 working days of the close of the [2008] show" serve notice of their intent to terminate prior to the 2010 show. (Contract 2–3.) REI contends that AASP's March 2008 notice was ineffective because it was given before AASP received REI's 2008 show report. (Pl.'s Reply Mem. 7–8.) Fourth, the Contract requires that AASP send notice "by registered mail." (Contract 3.) REI notes that AASP's termination letters were not sent by registered mail, although it does not deny receiving them. (Pl.'s Mem. 4 & n. 3.)

Before turning to the Contract itself, it is important to note that REI does not dispute that AASP sent the aforementioned letters to REI in March 2008, or the communications at the July 2007 meeting that led to those letters.

### 1. Discontinuation Clause

■ REI contends that AASP's March 2008 letters did not constitute proper notice to discontinue the Contract prior to the 2010 show because AASP attempted to

make its notice effective sooner than the Contract allowed. According to REI, within forty-five days of the 2008 show, AASP was required to notify REI that it intended "to discontinue the agreement *after* the 2009 show." (Pl.'s Mem. 4 (quoting Contract 3) (emphasis added by REI).) Instead, within forty-five days of the 2008 show, AASP told REI that it wished to discontinue the agreement immediately, that is, *before* the 2009 show.[3]

█ REI's claim fails under the "erroneous date" rule, which New York recognizes and which directs that "a termination notice which erroneously identifies the termination date is nonetheless sufficient to effect a termination as of the first proper termination date." *G.B. Kent & Sons, Ltd. v. Helena Rubinstein, Inc.,* 47 N.Y.2d 561, 419 N.Y.S.2d 465, 393 N.E.2d 460, 461 (1979).[4] In *Kent,* one party sent another a letter on September 16, 1971, stating that their contractual relationship will "terminate when the contract expires on December 31, 1971." *Id.* This notice was ineffective to terminate the contract at the end of 1971 because one year's notice was required. *Id.* at 462. But the notice was nonetheless held to be effective to terminate the agreement as of December 31, 1972, the earliest permissible termination date after the notice was given. *Id.* Similarly, even though AASP's March 2008 notice prematurely identified the 2008 show as the last show covered by the Contract, the "erroneous date" rule mandates that notice terminates the Contract at the "first proper termination date," that is, after the 2009 show.

REI insists that the "erroneous date" rule does not apply where it would cause prejudice. (Pl.'s Reply Mem. 8.) But *Kent* expressly refused to decide whether such an exception exists. *See Kent,* 393 N.E.2d at 462 ("We do not find it necessary ... to determine whether ... the erroneous date rule is inapplicable where it is shown that its application would work a forfeiture or other prejudice or that there were other equitable considerations which should preclude its application."). Further, REI does not cite, and the Court has been unable to find, any subsequent New York case recognizing such an exception. To the contrary, New York courts have repeatedly relied on the "erroneous date" rule without mentioning any exceptions. *See, e.g., Am. Food & Vending Corp. v. Int'l Bus. Mach. Corp.,* 245 A.D.2d 1089, 667 N.Y.S.2d 545, 546 (1997); *Ellman v. Chatwal,* 209 A.D.2d 287, 631 N.Y.S.2d 1 (1994); *Robert J. McRell Assocs., Inc. v. Ins. Co. of North America,* 677 F.Supp. 721, 726 (S.D.N.Y.1987); *Colman & Hirschmann, Inc. v. Little Tikes, Inc.,* No. 84–CV–1296, 1986 WL 4688, at *5 (S.D.N.Y. April 17, 1986).

Even if New York did recognize a prejudice exception, it would not apply here. Under the contract in *Kent,* upon receiving notice of termination, the non-terminating party had sixty days to exercise certain option rights. The prejudice exception theoretically possible in *Kent* would have arisen if that party was somehow prevented from taking advantage of its option rights because of the botched notice. As the court explained, "[t]o accept [the non-

---

**3.** As noted, the Court has ruled that AASP believed, in good faith, that REI had permitted such immediate termination in light of the July 2007 and March 2008 communications from REI officials. While this did not excuse AASP from its contractual obligations regarding the 2009 show, it did, in the Court's view, justify denial of REI's claim for specific per-

formance. *See Rockland Exposition, Inc.,* 2009 WL 1154094, at *11–*14.

**4.** The Court of Appeals noted, in *Kent,* that the erroneous date rule "had its origin in *Lyon v. Pollard,* 20 Wall. (87 U.S.) 403, 22 L.Ed. 361 [ (1874) ] and has received continuing if only occasional recognition." 393 N.E.2d at 462 (citations omitted).

terminating party's] argument in this case would be to carve out an exception to the erroneous date rule whenever provision is made for rights contingent on termination or receipt of notice thereof." *Kent,* 393 N.E.2d at 462.

REI did not have any rights that were "contingent on termination or receipt of notice thereof," and, thus, could not possibly have been prejudiced by AASP's premature notice. Indeed, none of the "prejudice" which REI alleges has anything to do with the erroneously premature notice. Instead, each of REI's alleged injuries are either self-inflicted or the result of AASP's nonperformance related to the 2009 show.

For example, REI contends that if AASP had notified it after the 2008 show that the 2009 show would be the last contracted show,

> REI would have had the opportunity to (1) inform its vendors in May, 2008, that REI would continue its NORTHEAST show (without the sponsorship of AASP after the REI 2008 NORTHEAST show); (2) seek a new sponsor; (3) assure the trade from May, 2008, through July, 2009, that REI's NORTHEAST show in 2010 would have the most comprehensive and up-to-date information on new products, services and developments in the industry (thereby making it highly impractical for AASP to even put on a 2010 show); (4) be able to use its 2009 NORTHEAST Show to prepare, market, and promote the REI-run future NORTHEAST shows to the trade and directly to attendees, vendors and potential sponsors; and (5) to use the 2009 REI-run NORTHEAST show as a showcase event for REI to demonstrate what it would offer to future sponsors, vendors and automotive professionals.

(Pl.'s Reply Mem. 4.) But, on March 27, 2008, the day before the 2008 show, AASP informed REI that "the upcoming event will be the last one held through your company for the present and foreseeable future." (Furgang Aff. Ex. C.) At best, REI's claims of prejudice might apply to the 2009 show, but because AASP had the contractual right to terminate any obligations regarding the 2010 show just after the 2008 show, it is difficult to understand REI's claims for prejudice, especially given that REI invited AASP to give the answer when it did about the 2009 and 2010 shows. Thus, REI's alleged failure to prepare to put on a 2010 show without AASP is baffling, and, in any event, not the type off prejudice that would thwart application of the erroneous date rule.

REI further complains that the "application of the 'erroneous date' rule would deprive REI of its contractually bargained for right to a period of 4 months before and 4 months after the last contracted show in which AASP 'will not be involved in or endorse any other related exposition.'" (Pl.'s Reply Mem. 9 (quoting Contract 3).) But this is not prejudice that flows from the *early* notice of the Contract's termination. Rather, as to the 2009 show, it is a simple breach of contract for which, as this Court has already ruled, REI may be entitled to damages. *See Rockland Exposition, Inc.,* 2009 WL 1154094, at *9, *15. As to the 2010 show, any economic impact on REI derives merely from AASP's contractual right not to participate in the 2010 show. Put bluntly, AASP gave REI two years' notice of termination, as was contemplated in the plain language of the Contract. Accordingly, although AASP's March 2008 termination notice "jumped the gun" in purporting to take effect immediately, this Court follows the "erroneous date" rule in holding that the notice effectively cancelled the Contract prior to the 2010 show.[5]

---

**5.** Other points made by REI require little comment. First, REI claims, that quite apart

## 2. Non-Compete Clause

REI also insists that compliance with the non-compete provision is a "condition precedent" to effective termination of the Contract. (Pl.'s Reply Mem. 5.) Thus, REI argues, violating this clause not only constitutes a breach of contract, but actually causes the Contract to be involuntarily renewed. (*Id.*) Nothing in the Contract supports such a reading. While the non-compete clause does immediately follow the discontinuation clause, the non-compete clause makes no reference to termination. Instead, it stands alone, stating only that "[i]t is further agreed that AASP[ ] will not be involved in or endorse any other related exposition four months prior or four months after the latest contracted exposition." (Contract 3.)

Moreover, the non-compete clause and all of the evidence REI improperly added as part of its reply in support of its motion regarding the violation of this clause (which the Court has considered anyway) relate, at most, to the question of AASP's breach of the Contract as to the 2009 show. But, again, the evidence relevant to REI's damages from this breach has no bearing on whether AASP terminated the Contract, and thus had no obligations (including any non-compete requirements), with respect to the 2010 show. Indeed, the plain language of the Contract makes clear that the non-compete clause applies only to those shows to which AASP is contractually bound. Put another way, had AASP terminated after the 2008 show, while it would have been bound both to jointly put on the 2009 show with REI and to honor its non-compete restrictions as to that show, it would have been free to do whatever it wanted in 2010, including compete with REI.

In support of its position, REI relies heavily on *Filmline (Cross-Country) Prods., Inc. v. United Artists Corp.*, 865 F.2d 513 (2d Cir.1989). There, Filmline agreed to produce a film which United Artists ("UA") was then obliged to purchase, so long as the film complied with the agreement. *Id.* at 514. UA later sent Filmline a "termination notice" claiming that the film violated the agreement and stating that UA would not accept delivery. *Id.* at 516. This purported termination of the agreement, however, violated a provision of the contract requiring UA to allow Filmline "to cure, correct, or remedy [a] breach or default within thirty days of written notice specifying [the] same." *Id.* at 518.

*Filmline* is inapposite for three reasons. First, *Filmline* dealt with the right to refuse tender of bargained-for goods, while the instant case concerns the renewal/termination of a contract. Second, the provision that UA violated in *Filmline* was

---

from any premature timing, AASP's March 2008 letters failed to terminate the Contract. (Pl.'s Mem. 3–4.) In particular, REI finds ambiguity in AASP's language that the "contract has expired," and that AASP "has elected to sever its business relationship with [REI] and will not be entering into any agreements with [REI] involving its 2009 Trade Show." (*Id.*) REI is in denial. The Contract required no specific termination language but only mandated that AASP notify REI if it "wish[ed] to discontinue" the Contract "after the last contracted show." (Contract 3.) Particularly in light of the undisputed request by REI to have AASP indicate if it wanted to work with REI on the 2009 show and beyond, the Court is comfortable in finding that a letter stating that AASP "has elected to sever its business relationship with [REI]," and that AASP does not want to "enter[ ] into any agreements with REI involving the 2009 Trade Show" left nothing to the imagination.

Second, REI thinks it matters that in discovery it has uncovered evidence that AASP decided in February 2008 to terminate the Contract. This is irrelevant to the question of whether the *notice* AASP provided to REI of this decision was sufficient to terminate under the Contract.

intimately connected with its right to refuse tender. While it might have been unfair to allow UA to refuse acceptance of the film without providing Filmline with its contractual right to cure alleged defects, here, AASP's breach of the non-compete provision related to the 2009 show is unrelated to its decision to terminate the Contract before assuming any obligations related to the 2010 show. Third, and most importantly, the contract in *Filmline* made the thirty-day repair period an explicit prerequisite to its termination, *id.* at 515, whereas nothing in the Contract here suggests that breach of the non-compete provision would trigger involuntary renewal of the Contract.[6]

### 3. Show Report Clause

REI contends that AASP's notice of termination was ineffective because it was issued before AASP received REI's 2008 show report. (Pl.'s Reply Mem. 7–8.) The Contract provides that "AASP[ ] further agrees that after receiving the [2008] show report and the estimated proposal for the following years [sic] event they must within forty-five days of the close of the 2008 show … serve written notice by certified mail that they wish to discontinue this event after the [2009] event." (Contract 2–3.)

Contracts "are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight." Restatement (Second) of Contracts § 202(1). Here, the "show report" clause appears designed to guarantee that AASP would have full information regarding the most recent show before it would have to decide whether to

renew or terminate the Contract. The sentence in which the show report clause appears imposes an obligation on AASP, stating that "AASP[ ] … agrees" that "they must" provide notice within forty-five days of the last show, or face automatic renewal. (Contract 3.) As a dependent clause in this sentence, the show report clause conditions this obligation; it makes clear that AASP need not give notice until "after [it] receiv[es]" the report. Thus, if REI neglects to supply AASP with a report in time to meet the forty-five day deadline, AASP gets an extension.

REI seeks to convert this extension clause into a requirement that AASP must satisfy before it is able to provide effective notice of termination. This fits neither the language nor the evident purpose of the clause. The clause does not say that AASP cannot give notice before receiving the report; only that it must after receiving it. Further, REI has not explained why it would add a clause to prevent AASP from providing *too much* notice of termination. To the contrary, REI repeatedly has asserted that *too little* notice has been catastrophic to its business. (*See, e.g.,* Pl.'s Reply Mem. 4–5.); *cf. Ives v. Mars Metal Corp.*, 23 Misc.2d 1015, 196 N.Y.S.2d 247, 249 (Sup.Ct.1960) (holding that defendant cannot invoke his own insolvency as reason to terminate the contract since "any provision in the contract to this effect was not for the benefit of the defendant").

At any rate, even if the "show report" clause did require that AASP receive the report regarding the 2008 show before giving notice, AASP's premature

---

6. REI's reading of the non-compete clause is also extraordinary because it would effectively contract-around the courts' traditional discretion in determining whether to order the equitable remedy of specific performance. *See Rockland Exposition, Inc.*, 2009 WL 1154094, at *10 (collecting cases on specific

performance). Indeed, the Court has already refused to order AASP to comply with the non-compete clause. (*Id.* at *15.) Adopting REI's reading of the clause would undermine that ruling by requiring AASP to either comply with the non-compete clause or face perpetual renewal of the Contract.

notice is still effective. Under New York law, timely notice that violates the terms of the contract is proper so long as it is actually received and no prejudice results. *See Yarmy v. Conte,* 128 A.D.2d 611, 513 N.Y.S.2d 21, 21 (1987) ("[T]he notice of termination of the contract . . . was premature and failed to meet the technical requirements of the contract. Nevertheless, it served to terminate the contract. . . ."); *Ives,* 196 N.Y.S.2d at 249 (holding that "[w]here actual notice of termination has in fact been given, the form is of little import," even where the form violates the contract, and insisting that "it would be hypertechnical in the extreme to hold otherwise"). Here, there is no evidence that AASP might have changed its mind about continuing its relationship with REI had it only withheld its termination letter until after receiving REI's 2008 report, nor does the Contract require that it do so. Thus, AASP's notice, even if premature, did not prejudice REI. Accordingly, to say, as REI does, that the notice was too early to be effective is "hypertechnical in the extreme." *Ives,* 196 N.Y.S.2d at 249.

### 4. Registered Mail Clause

■■■ REI notes that neither of AASP's termination letters was sent by registered mail, as required by the Contract. (Pl.'s Mem. 4 n. 3.) Under New York law, notice is not rendered ineffective simply because it was sent by non-registered mail, unless the party being notified did not receive the notice, or was otherwise prejudiced thereby. *See Suarez v. Ingalls,* 282 A.D.2d 599, 723 N.Y.S.2d 380, 381 (2001) (holding that there was "no merit to the plaintiff's argument that the cancellation [of the contract] was ineffective because it was not sent by certified mail," and noting that "[s]trict compliance with the contract notice provisions was not required because the plaintiff does not claim that she did not receive actual notice, or was prejudiced by the deviation"); *Dellicarri v. Hirschfeld,* 210

A.D.2d 584, 619 N.Y.S.2d 816, 817 (1994) (rejecting claim that notice by uncertified mail was ineffective because "defendants do not claim that they did not receive actual notice or that they were in any way prejudiced as a result of this minimal deviation"). There is no dispute that REI received AASP's letters, and REI does not claim prejudice from the method of delivery. Therefore, AASP's notice was effective.

### 5. Remaining Issues

REI makes only two other arguments that require comment. First, REI asserts that summary judgment for AASP is foreclosed by the law of the case. (Pl.'s Reply Mem. 9–10.) This is inaccurate as the Court's earlier opinion only concluded that AASP had not terminated the contract, as it was contractually obligated to do, to avoid any obligations regarding the 2009 show. *See Rockland Exposition, Inc.,* 2009 WL 1154094, at *9 ("[T]he Court finds that the 2004 Agreement governed the relationship between the Parties through the 2009 Northeast Trade Show."). The Court issued no ruling, because it was not asked to, regarding AASP's contractual obligations regarding the 2010 show.

Second, REI claims that remaining factual disputes prevent AASP from obtaining partial summary judgment here. In particular, REI claims that it has enough evidence to establish prejudice from AASP's premature termination in March 2008. (Pl.'s Reply Mem. 9–10.) Yet, the only prejudice proffered by REI relates to AASP's breach regarding the 2009 show. REI, not surprisingly, has failed to tender even the possibility of producing evidence that it was prejudiced by AASP's decision to terminate at least forty-five days earlier than was allowed as to the 2010 show. Therefore, there are no factual disputes

that stand in the way of granting AASP partial summary judgment.

### III. Conclusion

For the reasons stated herein, Plaintiff's motion for partial summary judgment is denied, and Defendants' cross-motion for partial summary judgment is granted. The Clerk of Court is respectfully directed to terminate the pending motions. (Dkt. Nos. 81, 89.) The Court also denies as moot Defendants' request that the Court strike portions of REI's reply affirmation. SO ORDERED.